LEWIS *et al. vs.* BOARD OF COMMISSIONERS OF ROADS AND REVENUES OF GORDON COUNTY.

1. Where a case was referred to an auditor, who reported thereon in favor of the plaintiff, the report was accepted by the court, and opportunity given to all parties to except, if they failed to do so within the time prescribed by the order, or having excepted there was a finding against them, the judgment should have been entered in favor of the plaintiff upon the report.

(*a.*) Two *fi. fas.* were issued against a county treasurer and his sureties, for his default in paying over taxes. The treasurer and his sureties separately filed affidavits of illegality to each of these *fi.*

*fas.*, and the cases were returned to the superior court. The affidavits of the principal and sureties were attached to the *fi. fas.* to which they were respectively applicable; and the two cases were entered on the docket. Both cases against principal and sureties were referred to an auditor, to take the account between the treasurer and the county. A report was made in each, finding the amounts due on each respectively; and leave was given to except thereto. The principal alone excepted, and his exceptions were disallowed:

*Held,* that the sureties were parties to this proceeding, and were bound as to the amounts so found. A suit admits of various defences by all or each of the defendants, but each separate defence does not make a new and distinct suit.

(*b.*) It makes no difference that the sureties did not appear before the auditor or except to his report, if they had an opportunity of doing so.

2. Where the bond of a county treasurer was absolute on its face, and it did not appear, either from it or any other writing prior or contemporaneous therewith, that it was left with the ordinary on condition, after breach of the bond by the principal, the sureties could not set up by way of defence, and establish by parol, that when they signed the bond and left it in the hands of the officer authorized to receive it, they stated to him that they were not to be bound until other sureties, whom they named, had also signed. And especially is this the case where several years elapsed, during which the sureties failed to inform themselves, or even make inquiry as to whether such condition had been performed, and where, in consequence of the bond thus made, their principal received his commission as county treasurer; and received the public revenue for which he failed and refused to account.

3. Section 2693 of the Code, which provides that possession of a deed by the grantee is presumptive proof of its delivery, which may be rebutted, must be construed with other sections *in pari materia;* and so construed, it was the purpose of the Code to relax the old common law rule which made possession of a deed conclusive evidence of delivery, so as to reach the case of a party whose conduct is purposely fraudulent or will effect an unjust result.

4. It is the duty of the governor to take the bond of a county treasurer, administer the oath of office, and thereupon deliver his commission to him. Not being able to attend to these details in person, he may by his *dedimus potestatem* devolve this duty upon one of the officers of the state authorized to administer oaths. The power of such officer is specified and limited; and inasmuch as it grows out of the laws of the state, the sureties signing the bond are conclusively presumed to know its extent. The law enters into and becomes a part of such contract as effectually as if set

out therein.   The consent of an officer acting under such *dedimus potestatem* to stipulations beyond this grant of power, would be in excess of his authority and void.

5.  To permit these sureties—after the bond has been executed and returned, and the commission issued to their principal, who has acted under it, and received and failed to account for the public revenue—to set up, as a defence to a proceeding founded on such default, that they stated to the ordinary who took the bond that they would not be liable till certain others signed it, would be to allow them to take advantage of their own wrong.   They are estopped from so doing.

(*a.*)  It is not claimed that the alleged conditional execution of the bond was ever made known to the governor; nor will we presume that he would have illegally approved such an arrangement, had he known it.

April 10, 1883.

Auditors.   Parties.   *Res adjudicata.*   Practice in Superior Court.   Bonds.   Officers.   Contracts.   Principal and Surety.   Estoppel.   Before Judge BRANHAM.   Gordon Superior Court.   August Term, 1882.

To the report contained in the decision it is necessary to add only the following:   One ground of the affidavit of illegality filed by the sureties to one of the executions was as follows:

"That at the time the pretended bond of J. H. Arthur was signed by them, and before it was left with D. W. Neal, the ordinary of said county, they distinctly notified said ordinary that they had signed the same on the condition and understanding that the bond was not to be then delivered or considered or accepted by him as the bond of said Arthur, until Joseph J. Printup and W. J. Fuller also signed said bond as co-sureties with deponents of the said Arthur; and the instrument was left with the said Neal, that said co-sureties might sign the same, and said ordinary was so notified, and directed not to accept the said instrument as a bond, or consider it binding on deponents till this was done.   This condition was never complied with, and the instrument sued on was never delivered as their

bond, and they never have at any time waived the condition insisted on at the time, as above set out."

The affidavit filed to the other execution contained substantially the same ground. The defendants offered parol testimony in support of this ground, and the following colloquy between the counsel and the court occurred:

THE COURT.—"Now, gentlemen, you propose to prove by these witnesses, the defendants and E. D. Hudgins, as I understand, that when the bond was made, sometime in the early part of 1873, according to the date of the bond,—with the explanation of the ordinary, the fourth of February of that year, these parties signed the bond in the presence of the ordinary, and left it with him, and stated at the time that they were not to be bound by it, or that it was not to be the bond of Arthur and the defendants until W. J. Fuller's and J. J. Printup's names were inserted in the bond and it was signed by them also as sureties."

MR. McCAMY, of counsel for defendants.—"That is our position. We offer to show by Pulliam and Lewis and Hudgins, that the facts stated in the illegality as amended, are true."

THE COURT.—"At the same time, you do not deny that you signed the bond in the presence of the ordinary and left it there with him."

MR. McCAMY.—"We do admit it was done in his presence."

THE COURT.—"And you left it then with the statement that you would not be bound by it until it was signed by these parties?"

MR. McCAMY.—"Yes, sir."

THE COURT.—"I will rule it out."

MR. McCUTCHEN.—"It was not delivered as our bond."

THE COURT.—"That is your conclusion."

MR. SHUMATE.—"Mr. Lewis desires to state that bond was never out of the hands of the ordinary, and was not taken out by Arthur or by any one else, but remained there for the purpose of getting the other sureties to come in and sign it."

THE COURT.—"That appears in the evidence before me, and is one ground upon which I base my decision."

The jury found a verdict in favor of plaintiffs, judgment was entered, and defendants excepted.

McCUTCHEN & SHUMATE; R. J. McCAMY, for plaintiffs in error.

E. J. KIKER; W. K. MOORE, for defendants.

HALL, Justice.

Two *fi. fas.* were issued against the county treasurer of Gordon county and his sureties, for his default in paying over the taxes due to the county in the years severally set forth in each of them. To these *fi. fas.* the tax collector filed affidavits of illegality, and the sureties also filed such affidavits. The affidavits of the principal and sureties, made separately, were alike in all respects, except that there was one ground in the latter which was not in the former. The *fi. fas.* and affidavits were returned to Gordon superior court. The affidavits of the principal and sureties were attached to the *fi. fas.* to which they were respectively applicable, and the two cases were entered upon the proper docket. Both cases, against principal and sureties, were referred to an auditor, to take the account between the treasurer and the county. The auditor made his report in each, and found the amounts due on each respectively. This report was returned and allowed by the court, and leave was given to except thereto. The county treasurer alone excepted, and his exceptions, after a proper hearing, were found against him and disallowed. Then the report was made the judgment of the court. When these affidavits of illegality came up for a final hearing, the counsel for both parties agreed to submit to the judge the determination of the point, both upon the law and the facts as above substantially set forth, whether the report of the auditor and the judgment thereon were conclusive upon the sureties as to the amount found. The court determined that they were concluded thereby as to that fact.

1. The correctness of this ruling depends entirely upon the fact of the sureties being parties to the proceeding before the auditor; for it cannot be denied that if they were, and his report was returned and accepted by the court, and an opportunity was given to all the parties to except, and they failed to avail themselves of the privilege within the

Lewis *et al. vs.* Board of Commissioners of Roads and Revenues of Gordon Co.

time prescribed by the order, or having availed themselves thereof, there was a finding against the exceptions, then, in either event, judgment should have been entered in favor of the plaintiff upon the report. Code, §§3137, 3138, 3140, 3097, 3097 (d), 4203, and cases cited under each in Code of 1882.

It is said, however, that the evidence before the judge below did not authorize his conclusion that the sureties were parties to the reference to the auditor and the proceedings before him, for the reason that they set up defences to the *fi. fa.* separate from those made by their principal; that the clerk entered but two cases on the docket, when he should have entered four. We are of a different opinion. There were only two *fi. fas.* to which affidavits of illegality were filed. The sureties were parties to these *fi. fas.*, and the *fi. fas.* were the foundations of the suits returned to the court. That a suit admits of various defences, joint or several, by all or each of the defendants, will not be questioned; but we have yet to learn that each separate defence makes a new and distinct suit. We know of no such practice, and feel assured that neither law nor precedent can be found to justify it.

It does not matter that the sureties did not appear before the auditor, or that they did not see proper to except to the report. It is sufficient that an opportunity was afforded them to do both, and if they neglected to avail themselves of it, and chose to rely upon their principal to make defence for them, the consequences of their neglect should not be chargeable to the plaintiff. Besides, one of the purposes of the reference and report was to settle, by a single proceeding, the very question which they were seeking to open, and thus to avoid two investigations into the account. In addition to this, they did not attempt to show by any specifications in their pleadings, after the report was made and accepted by the court, any error in the amount found by the auditor.

2, 3, 4, 5. The next question we shall consider is whether

70–32

a condition or stipulation, not appearing in the bond or by any other writing contemporaneous with its execution, or at any prior time, to the effect that, when the sureties signed said bond and left it in the hands of the officer authorized to receive it, they stated to said officer that they were not to be bound until other sureties, whom they named, had also signed the same, constitutes a defence, which can be established by verbal testimony, and which will relieve them from liability upon their obligation; especially after a lapse of several years, during which time, so far as appears, they have failed to inform themselves, or even to make inquiry whether said condition has been performed, and when, too, in consequence of their obligation thus made, their principal received his commission as county treasurer, and under it received the public revenue, which he has squandered, and for which he utterly fails and refuses to account to the proper authorities. The court below held that the defence could not be established by this species of evidence; and we think this decision was according to law and sound policy.

It was not denied in the argument that a condition could not be added or annexed by parol testimony and made a part of so solemn an instrument; but it was urged that the defence went to and denied the execution of the bond; and if not strictly and technically so, it was in effect a plea of *non est factum*,—the bond was not in fact delivered, nor was it intended by them as a delivery, either absolutely or conditionally; it was certainly not an *escrow*, because its execution was incomplete and it was not placed in the hands of a third person to be delivered to the obligee when the condition upon which it was to take effect had been complied with; and finally, that the transmission of the bond to the department having control of it, before the condition upon which it had been left with the ordinary had been fulfilled, and the other securities named had signed it, operated as a surprise and fraud upon them.

From what occurred, as well as from what appears upon the pleadings and from defendants' offers of proof, we are not authorized to impute bad faith or fraud to this agent of the government, who was a public functionary, and whose duties in this behalf were accurately defined by law and were necessarily supposed to be as well known to them as to the agent himself; in fact, all persons are charged with a knowledge of the law, and are bound, at their peril, to take notice of its provisions. We have seen the allegations of this third ground of the affidavit of illegality; and all that these defendants proposed to establish by parol testimony was the facts therein set forth, and these facts go only to the extent of showing that it was the understanding of the affiants that the bond was not to be considered as delivered, and that they were not to be bound until it was signed by the other securities named by them, and that he had notice of this arrangement; but they neither allege nor offer to prove that he consented to hold this bond or to accept their execution of it upon the condition mentioned, or that he gave them any reason to believe that he would do so. In the absence of this controlling fact, it would be going very far to presume that he misled them, either by word or act, or that he was under any promise, either expressed or implied, to carry out the arrangement made among themselves; the presumption, on the contrary, is that he declined to place himself in the inconsistent attitude of representing parties whose interests might conflict and possibly lead to a failure on his part to keep faith with one or the other. Without a distinct agreement with him that he would observe and carry out the arrangement among themselves, they should have withheld their signatures to the bond until those they desired to sign had done so, or at least until they were well assured that they would join them in the obligation. It is not intimated, nor can we discover from anything contained in this record, that the persons named as additional securities had ever been consulted, or had.

ever given them assurances that they would become parties to this obligation. They seem to have proceeded rather upon the expectation or hope that they would do so, than upon any well grounded assurance to that effect. While we are reluctant to impute to them a design to mislead or entrap the ordinary, or to suggest the possibility of their resorting to a device to escape liability after affixing their signatures, rather than forfeit the friendship of their principal by refusing to become his bondsmen, still, it seems to us that their conduct was so loose and incautious as to excite suspicion that their intentions were neither candid nor fair.

We cannot recognize the ingenious and subtle distinctions made by their able and indefatigable counsel. To do so would be to evade or overthrow rules which the experience and wisdom of ages have devised and strictly administered for the protection of property and the security of rights, both private and public; and for that purpose there is none more effective than that which forbids alterations or additions to be made to writings deliberately executed and placed in the hands of a party who appears from their terms to be entitled ultimately to their possession. An *escrow*, which is a deed delivered to another, to be by him delivered, on certain conditions, to the grantee, is a seeming rather than a real exception to the rule. Code, §2693. While the same section of the Code provides that possession of the deed by the grantee is presumptive proof of its delivery, which may be rebutted, it is silent both as to the character of the evidence by which this is to be done, and the circumstances which will overcome the presumption. This must be construed with other portions of the Code having relation to the subject, as with §2757, subdivision 1, which declares in express terms that parol evidence is inadmissible to add to, take from, or vary a written contract, and §3809, which prohibits a deed, absolute on its face and accompanied with possession of the property, from being proved at the instance of the

parties, by parol testimony, to be a mortgage only, unless fraud in its procurement is the issue to be tried, and §3762, which declares written evidence of higher proof than oral, and in all cases where the parties have reduced their contract, agreement or stipulation to writing and assented thereto, the writing itself is the best evidence of the same. But, however solemn may be the form and character of a written instrument, parol evidence is always admissible to show that it was either originally void or has subsequently become so. *Ib.*, §3802. These provisions of our Code are, with few exceptions, declaratory of well settled common law rules; and to comprehend them fully, we must resort to reported cases and writers of acknowledged authority for their proper exposition and application.

The strictness of the ancient common law rule, which made the possession of the deed conclusive evidence of its delivery, has been so relaxed by later authorities, "that it may be applied so as to reach the case of a party whose conduct is purposely fraudulent or will effect an unjust result." 16 Wallace, 4. This is evidently the purpose of our Code. in providing that the possession of the deed by the grantee is presumptive proof of its delivery, which may be rebutted. When this is taken in connection with the other sections of the Code cited, and construed *in pari materia* with them, we think there can be little doubt as to the purpose for which this modification of the ancient common law doctrine was expressly authorized. Applying the law as thus qualified to the actual facts of this case, we are led to the conclusion that the court below committed no error in sustaining a demurrer to the defence set up by the sureties, and we shall now proceed to sustain that conclusion by reasons and authorities which strike us as satisfactory and controlling.

The fact that these sureties were dealing with a public agent. who was acting under specific instructions, contained in the law of the land, with a knowledge of which they are chargeable, is a circumstance of the weightiest

character in determining their rights and fixing their liability.   In the case of Dair *vs.* The United States, 16 Wallace, 3, Mr. Justice Davis, who delivered the opinion of the court, said: ·'It is important that the question involved in this case should be settled, on account of the various interests connected with the administration of governmental affairs requiring official bonds to be taken, which, as a general thing, are rarely executed in the presence of both parties.   It is easy to see, if the obligors are at liberty, when litigation arises and loss is likely to fall upon them, to set up a condition unknown to the person whose duty it was to take the bond, and which is unjust in its result, that the difficulties of procuring satisfactory indemnity from those who are required by the law to give it, will be greatly increased.   Especially is this so, since parties to the action are permitted to testify."   In an able decision pronounced by the Supreme Court of New Jersey, as late as the year 1879, (12 Vroom, 403, 406, 41 N. J. R.), in a case very like that under consideration, Chief Justice Beasley enforces this view by reasoning so cogent that it can hardly fail to rivet conviction upon any unprejudiced mind.   Among other things, he says of the public functionary authorized to take the bond:  " He has no authority to do more than this," *i. e.* to accept a delivery of the bond; " he is not empowered to make terms, or to assent to any conditions in behalf of his principal, and being a public officer, the extent of his ability is known to all persons dealing with him.   The receipt of the bond on the part of " the agent to take it " is a mere ministerial act, and in doing it he is the deputy of the ordinary" ; (in this case of the governor).  " It is, too, an official act; and being a public officer, he cannot in such a transaction be the agent of an individual."

Our Code, §2194 provides that the principal is bound by the acts of the agent within the scope of his authority, and no further, unless he sees proper to ratify his conduct in whole but not in part.   And where the agency is " special for a particular purpose," persons

dealing with the agent should examine his authority. *Ib.*, §2196. In this case it was the duty of the governor to take the bond, to administer to the principal therein the oath of office, and thereupon to deliver to him his commission; it was not essential, however, to give his personal attention to such details, but he might, by his *dedimus potestatem*, devolve this duty upon one of the officers of the state authorized to administer oaths. Code, §60. Here the *dedimus* issued to the ordinary authorized him to administer the oath of office therewith sent, and upon the county treasurer taking and subscribing the same and giving the bond required by law, the proceedings were to be certified to the governor, that they might become a record. In obedience to this *dedimus*, the ordinary did certify to the governor that the county treasurer had come before him and taken and subscribed the official oath and executed the official bond sent from the executive department with said *dedimus*; that the bond was for the sum of twenty thousand dollars, and the names of the securities, Joab Lewis, J. A. Pulliam, Samuel Pulliam and Albert Nichols; and that he had delivered to the said county treasurer his commission. It will be perceived, from these proceedings, that the only authority the ordinary had was to take the oath of the county treasurer, and have the bond sent from the executive departments executed, and to make due return of his proceedings in that behalf. His consent to any stipulations or conditions, beyond this grant of power, would have been in excess of the power conferred upon him, and under the law would have been void. He was the deputy of the governor, and the extent of his powers in this matter growing out of the laws of the state, were known, or at least must be conclusively presumed to be known to these sureties. The law entered into and became a part of their contract as effectually as if its terms had been set forth in the instrument.

If it was executed upon any such condition as that set

up in the defence, this fact was never communicated to the governor, nor is it even intimated that such was the case; but if it had been made known to him, we are not to presume that he would, in open defiance of the law and plain violation of his duty, as prescribed, have ratified and approved any such arrangement. Whether this state of things is the result of deliberate design or incautious conduct upon the part of these sureties, they should not be permitted to set up a defence growing out of it. To allow them to do so, would be to enable them to take advantage of their own wrong, greatly to the detriment of the public interest, and in derogation of the wise and well settled policy of the state.

In the case of Dair *vs.* The United States, 16 Wallace, 1, where a bond payable to the United States, complete upon its face, as was the case in this instance, was placed in the hands of a co-obligor by his fellows, upon condition that it was not to be delivered until executed by other sureties, but which was in fact transmitted to the obligee in violation of the condition, it was held that they were nevertheless bound, because they had enabled the party holding it to deceive and mislead the obligee by its appearance, when it was not shown that he had knowledge of the existence of such condition, or notice of any fact which would put him upon inquiry to charge him with such knowledge. " It must be conceded," says Mr. Justice Davis, " that courts of justice, if in their power to do so, should not allow a party who, by act or admission, has induced another, with whom he was contracting, to pursue a line of conduct injurious to his interests, to deny the act or retract the admission, in case of apprehended loss. Sound policy requires that the person who proceeds on the faith of an act or admission of this character should be protected, by estopping the party who has brought about this state of things from alleging anything in opposition to the natural consequences of his own course of action. It is, accordingly, established doctrine that, whenever an act is done or statement made by a party,

'which cannot be contradicted without fraud on his part and injury to others, whose conduct has been influenced by the act or omission, the character of an estoppel will attach to what otherwise would be mere matter of evidence ;" citing 2 Smith's Lead. Cas., 7 ed., notes to Duchess of Kensington's case, 424. In support of the conclusion reached in this case, The State *vs.* Peck, 53 Me., 284 ; The State *vs.* Pepper, 31 Ind., 76 ; Millett *vs.* Parker, 3 Metc. (Ky.), 608 were cited. The case of The Ordinary of New Jersey *vs.* Thatcher *et al.*, 41 N. J. (12 Vroom) 403, is full upon the question.

According to our Code, §3753, a party will be estopped by admissions upon which others have acted, " either to their own injury" or " the benefit of the party making such admissions," and " in similar cases, where it would be more unjust and productive of more evil to hear the truth than to forbear the investigation." We cannot well conceive of a case which more urgently requires a strict enforcement of these wise and conservative, and at the same time liberal and just, principles than that presented by this record. The governor was the party required by law to take this bond; he was the agent of the state acting in this behalf, under powers limited and restricted by law ; the ordinary was only his deputy, and was necessarily acting under the same limitations and restrictions as his principal ; it was known to these obligors as well as to the ordinary ; they allege nothing to the contrary ; notwithstanding this, they endeavor to show that they made this bond only upon a condition to which the ordinary had no power to assent, and to which, in fact, from aught that appears, he did not consent ; their names filled up the space in the bond left for them ; there were no other seals attached than those opposite to which each signed his name, and no other names appeared in the body of the bond ; in this condition it was certified to the executive, without an intimation or suggestion, from any source whatever, that any condition was attached to its execution ; the principal received his commission in consequence of

these steps, took into his custody the public funds, squandered them, and when his sureties were called upon, years afterwards, to make good this default, they set up the claim that they did not execute and deliver this bond as it purports on its face to have been executed and delivered, and they gravely propose to establish these facts by their own testimony and that of one other witness. The danger to be apprehended from fraud and false swearing, as well as from the infirmity of human memory, is an ample vindication of the rule which, under these circumstances, requires the rejection of this character of testimony. It is not safe to leave the rights of parties, in such cases, to the memory of bystanders; especially when that is in opposition to what is written and signed by the parties. It seems to us that it is wiser and better to regard in such transactions " not what is said," but rather " what is done."

This rule, in none of its manifold applications, is of more worth than when it is employed as a safeguard to persons and communities who are, of necessity, represented by public officers. It must strike every one as an alarming idea, that any of the numerous bonds given to public officers may be defeated, if it can be made to appear by parol that any of the parties executing them stated to such officers that they were to be inefficacious, unless upon the happening of some event. The present case affords a fair illustration of the operation of such a pernicious principle. The parties themselves found this instrument in the hands of the ordinary for execution, under instructions from the executive department, as a security for the public funds belonging to the county; it was signed by them in his presence; his actings and doings in the matter were certified to the department, and became a record there; it was filed in the proper office, and duly admitted to record in the proper court of the county; and now, after the lapse of many years, when it becomes necessary to resort to it to indemnify the injured party, the endeavor is made to explode the entire transaction, by showing, by the oaths

of the parties interested and of one other person, that the instrument is a nullity, as it was executed on a condition that has not been fulfilled. In our judgment, law and public policy are in accord upon the subject, in declaring that such a defence, by the use of such means, cannot be made available. Ordinary vs. Thatcher, 41 N. J., 410.

We wish it distinctly understood, that all persons dealing with public officers, in matters pertaining to the care and expenditure of the public treasure, will be required to notice and comply with the safeguards provided by law for its preservation and protection, and that no conditions that may be agreed upon, contrary to, or in excess, or falling short of such legal requirements, will avail those who have undertaken for the fidelity of its custodian, to escape responsibility, in case of his default to perform his engagement, unless they are able to show, by competent evidence, to a reasonable certainty, that the agent on whom the duty is imposed of taking the obligation, has been guilty of intentional fraud or other wrong, in inducing them to become bound.

Judgment affirmed.