MATHIS, sheriff, *vs.* MORGAN.

72 517
6121 125

[This case was argued at the last term, and the decision reserved.]

1. One who became a surety on the bond of a bank as a state deposi-
tory cannot free himself from liability thereon, on the ground
that the governor selected the bank as a solvent bank, and pub-
lished it as one of the depositories, and that the surety was induced
to become such by this fact, though the bank was not solvent at
the time of its selection, and the giving of the bond by it. While
it is the duty of the governor to use his discretion in selecting a
chartered solvent bank, of good standing and credit, as a state
depository, the very object of requiring a bond is to guarantee the
solvency of the bank, and one who becomes a surety on such bond
cannot discharge himself on the ground that the bank was insol-
vent.
2. Nor can such a surety relieve himself, on the ground that he signed
the bond because of the selection by the governor, acting as the agent
of the state, and on account of the law of the state which required
the selection of a solvent bank, by reason of which the state rep-
resented the bank as solvent, and thereby made a false represen-
tation, on which the surety relied when he signed the bond. The
state accepts the bond for its own security; it does not guarantee
the solvency of the bank to the signers of the bond.
3. Where one who signed the bond of a bank as a state depository
resided in the city where the bank was located, and had opportu-
nity to investigate as to the condition of the bank before signing
the bond, but did sign and enabled the bank to receive money
belonging to the state, he could not relieve himself from responsi-
bility on the ground of false representations made by the governor.
(*a*.) The facts in this case do not show false and fraudulent or cor-
rupt conduct on the part of the governor.
4. The object of incorporation is to create an artificial being with

perpetual life, or life for a term of years, and it does not cease to be such, although all of the natural persons who were first members of the organization die, sell their interest, or otherwise cease to be stockholders.

(*a.*) If there was any impropriety in the transfer, the governor had no notice which was not equally accessible to the surety on the bond.

5. The sureties on the bond of a bank designated as a state depository are bound to see that the bank makes a faithful account of all the public money or effects received by it, whether from the tax collector or the treasurer.

6. Such a surety is not relieved from liability because his principal did not make returns to the governor strictly according to law, or because the governor did not remove or discontinue the principal as a depository.

(*a.*) The fact that the bond was not recorded on the minutes of the executive office, but was referred to in executive orders there recorded, did not relieve the surety.

7. Where a surety to a bond given to the state as security for a bank depository signs it before another surety, whose name precedes his in the body of the bond, but is forged thereto in the signature, and where the name of the same person, as well as that of another whose name appears before that of the complaining surety in the body of the bond, appear as having signed an affidavit that they were worth a certain sum, but in fact they never signed the affidavit at all, but their names were forged to it; and where the complaining surety entrusts the bond to the president of the bank as an escrow, not to be delivered to the state until these sureties execute it, but the president does deliver it to the governor, the obligee, with all the signatures apparently genuine thereon, such complaining surety is not discharged from responding to the state upon the breach of the bond, even though one of the signatures so to be obtained was a forgery.

(*a.*) Of one of two innocent persons, he who enabled the wrong-doer to do the wrong should suffer, rather than the other who put no trust in him and gave him no power to do wrong. Therefore, where the surety enabled the president of a bank to deliver to the state's agent a forged signature, when nothing appeared, in the face of the bond or otherwise, to put the governor on notice or inquiry, and the bank thereupon became a state depository and received the money of the state, the surety was estopped from asserting his freedom from liability on the ground that such signature was forged.

(*b.*) The affidavit and forgeries thereon did not affect the case, as the law does not require the sureties to justify, and as the governor was ignorant of the facts; nor is it material in what order the sure-

ties' names are stated in the body of the bond, the signature of the complaining surety appearing before the signature claimed to be forged.

May 13, 1881.

Principal and Surety. State. State Depositories. Bonds. Governor. Liens. Corporations. Estoppel Fraud. Before Judge BRANHAM. Floyd County. At Chambers. June 7, 1883.

The facts reported in the case of *Colquitt, governor, vs. Simpson & Ledbetter* (the second case preceding this) sufficiently report the appointment of the state depository, the bond given by it and the execution issued thereon. This execution was levied on certain property of Samuel Morgan, one of the sureties on the bond, and he filed his bill to enjoin the sale, alleging, in brief, as follows: It was the duty of the governor to appoint a solvent chartered bank as the state depository, and the order alleged that this had been done, and it was so published, thereby making representations which complainant believed, and on which he relied ; but in fact the bank was not a solvent chartered bank at that time, and the order of appointment was not passed until November 18, the bond having been given November 15. Complainant believed and relied on these statements in signing the bond. The Bank of Rome determined to retire from business, and on February 1, 1879, published a notice to the effect that on February 20 the business should come to an end. Subsequently, on February 20, A. Thew H. Brower, who was the president and owned and controlled all the stock, conveyed the certificates of stock, and sought to convey the franchises of the bank to Frost, Samuel & Company, and they conveyed back to him all of the property, real and personal, of the bank, the instrument of writing showing this transfer being signed by them only. The bill charges that, on February 20, the bank had no legal president or organization authorized to transfer its assets and franchises, and that the

conveyance to Frost, Samuel & Company did not authorize them to reorganize and transact business in the name of the bank; that if they did acquire the franchises and corporate powers of the bank, they allowed Frost and Huston, two members of the firm, to subscribe for and take two hundred shares, or more than half the capital stock; that they were both non-residents, and had no property in Georgia, except what they acquired in this transaction; and complainant is informed that Huston has denied making the subscription; and that the governor had notice of the facts, when he appointed the bank a state depository. On November 13, 1879, five days before the date of the order appointing the bank as a depository, the so-called stockholders held a meeting and passed resolutions, reciting that the governor had appointed the bank a state depository on November 11, and authorizing Samuel, the president, to accept the position, and in behalf of the bank to give the bond required as a state depository, and to sign the name of the bank thereto, and authorizing the cashier to affix the seal of the bank thereto. Thereupon Samuel, as president, and Panchen, as cashier, executed the bond on which the present execution was issued, and complainant signed as a security. It is charged that the complainant relied upon the representations and statements made by the governor, as to the solvency of the bank, the legality of the appointment, etc. Also, that the governor did not approve the bond, as required by law, and that the securities were not bound. Further, the bond was given to secure the state on account of moneys paid into the bank by the tax collectors of the counties named in the order of appointment, and for none other; that this only amounted to $29,517.70, while the balance of the amount claimed by the state ($23,500.00) had been placed in the bank by the treasurer, and did not arise from taxes in those counties, and the securities on the bond were not liable therefor. The bank failed, and made an assignment to one Reynolds in March, 1881; the courts held the state to be a preferred

creditor, and the state has received, partly by levy and sale and partly by direct payments, the sum of $31,442.26, which, it is insisted, should be first applied to the payment of amounts deposited by the tax collectors in the depository. Further, the bank did not make regular returns, as provided by law, and the returns did not contain a statement of the funds and condition of the business, and it is charged that the governor should have removed the bank from its office as a state depository, and having failed to do so, it would be inequitable to hold the securities liable. The sheriff has levied on certain property of complainant, and is proceeding to sell it. The prayer was for an injunction.

An amendment was made, which is set forth in the seventh division of the decision.

On the hearing, the bond, execution, resolution of stockholders, etc., referred to above, were introduced in evidence, and certain affidavits *pro* and *con*, which need not be detailed here. Where the evidence is material to an understanding of the ruling made, it is stated in the decision. The court granted an injunction, and the defendant excepted.

C. ANDERSON, attorney general; JACKSON & KING, for plaintiff in error. •

DABNEY & FOUCHE, for defendant.

JACKSON, Chief Justice.

This is another of the cases arising from the failure of the Bank of Rome as a depository of the money of the state. Morgan, one of the sureties on the bond of that bank as such depository, filed a bill against the sheriff of Floyd county to enjoin that officer from proceeding further in the enforcement of levies on the property of this surety, on various grounds set up in the bill and various affidavits therewith submitted to the chancellor in support of the allegations of the bill. The chancellor thereupon, and

upon the defences thereto made by the state, granted the injunction, and the state, through the sheriff, represented by the attorney general, assigns for error here the grant of that injunction.

1. The fact that the governor selected this bank as a solvent bank, and published the same as one of the depositories, and the allegation that the surety was induced by this fact to become one of the sureties, is no reason, in law or equity, for the discharge of the surety from his obligation, even if, at the time of the selection of this bank, it was not solvent and the governor was mistaken as to its solvency. The discretion is vested, by the act of 1879, in the governor to select " a chartered solvent bank of good standing and credit " in the city of Rome as such depository; but in the apprehension that the governor might make a mistake in its solvency, the general assembly had the caution and prudence to provide in the same act that the bank should, before entering upon the discharge of its duties, before it got possession and control of the public money, give bond and security that it would respond to the state for failure to do its duty under the law, and especially for its failure to account to the state for such public money or effects of the state as it might become possessed of under the act.

It would be anything else than reasonable or equitable that the man who obligated himself to see to it that the bank was solvent and would be able to respond to the state for the loss of its money, should be allowed to set up the fact of its insolvency, when appointed or afterwards or before, as a reason for his relief. This bond guaranteed the solvency of the bank and its ability to respond. It pledged him that, if the bank proved insolvent, so as not to be able to respond, then he would himself make good the state's loss. To state the proposition that a surety that another is able and honest enough to handle public money can discharge himself by proof that the other, whose surety he was at the time he got the money, was not then

able to respond, is to show its fallacy, and with all deference to the able and distinguished counsel of the surety who drafted this bill, its absurdity. To indorse for one insolvent at the time, and then to ask to be relieved of the effect of the indorsement because he was insolvent at that time, are two propositions which make no harmony in the ear of justice; the notes are wholly discordant and make a medley utterly without melody.

2. Nor is the case of the surety bettered because he put his name to the bond of the bank because by its selection by the governor as the agent of the state, and by reason of the law of the state, which required the selection of a solvent bank, the state represented it to be solvent, and thereby made a false representation, on which the surety relied when he signed the bond. This would be to make the state guarantee to the sureties of the bank the solvency of every bank it selected as its agent. It would be to make the state the surety of the sureties of the bank, if insolvent when selected, because the state, in every instance, is required to select, through its governor, a solvent, chartered bank, and to publish and thus to represent it as solvent. And thus we would have the singular anomaly that the party demanding security before parting with money itself indorsed that, when he did part with the money to the principal, that principal was solvent. Thus, in every case where the principal was insolvent at the time it got the money, the state would be first on the list of sureties, first indorser, and responsible over to all the other sureties and indorsers of that principal.

3. To relieve the surety in this case from conclusions so irresistibly unsound, making so clear a *reductio ad absurdum*, the bill alleges facts which, it says, make the governor, the agent of the state, knowingly and falsely select this insolvent bank. That is to say, it states facts which, it charges, make the governor of the state act in this matter corruptly, fraudulently and in total disregard of the obligations of his oath of office, and in so acting, caused

him to become the surety for this bank. Even if the facts alleged and proved made such a case, would the surety for this rotten and insolvent bank be relieved? Surely he should have known as much about the bank which he indorsed as the governor of the state did. He was a resident where the bank was located. He was about to become its indorser on a bond for fifty thousand dollars. His own interest required him to be on the alert. The magnitude of the bond demanded inquiry as to the bank's financial status. The principles of common sense, the foundation of all those principles, self-preservation, the first law of nature, as well as the well settled principles of law and equity in the books, put him on inquiry, and affected him with notice of the bank's condition. It was the state with which he was dealing. It was her money which he enabled this bank to get in its clutches. It was not the money of any agent of hers, of her chief magistrate, or any other of her officers; and when he was put on inquiry about the condition of the bank located at his door-sill, he was chargeable with notice of its condition, when he indorsed for it, and could not relieve himself by any false representation of her agent of which he had the notice that the inquiries of a prudent man in such a case required him to have.

But the facts do not show false and fraudulent or corrupt conduct on the part of the executive. Of what did he have notice? Only that about the first of that year, this bank had determined, in the hands of its then officers and stockholders, to close its business, and had notified its depositors and creditors to present their claims, and they would be paid; that the business had ceased to be profitable, and therefore, active business, as a competitor with others in banking, would cease. On or about the first of the year, this notification was made to the governor, and published in the Rome newspapers, with thanks to customers and depositors for the past, and the expression of a hope, if it should, or the then stockholders and president

should, resume business, its old customers would return to it or him with their patronage. In the last part of the year—the November following—the governor dealt with the application of the bank as a depository, and upon inquiry into its condition, from citizens of Rome, its solvency and credit, and among others, upon inquiry of one of the able counsel for those in this litigation with the state now about this bank depository, he adjudged and decided that it was a fit depository, on the strength of their indorsement of its solvency and credit. These were the basis of his false representations, if he made any. If this surety was injured by these representations, it would seem just that he should demand redress, not from the state, nor from her chief magistrate and agent, but from those who indorsed the standing and credit of this bank to the governor; but inasmuch as he himself indorsed the bank's solvency and credit too, not, indeed, perhaps with so much fervor and fluency as they did, by word of mouth and letter, but with the stronger emphasis of backing his judgment as her surety on a fifty thousand dollar bond, that the bank was solvent and of good standing and credit, his hope of redress from them would be slight, especially as he, too, lived in Rome, and had a greater interest than they had in investigating that standing and credit.

4. But it is again insisted that the bank had changed hands, and was no longer a chartered bank, because the then chief, if not only, stockholder and president had transferred all the stock and interest in it to Samuel, its president, when it was made the depository, and others. How that forfeited the charter, and made the bank, the entity, breathe its last breath, we do not so well understand. Banks constantly change hands. The stockholders, presidents, cashiers, all become new men from time to time, yet the entity lives, the same being in law which the state created. The very object of the incorporation is to breathe into organic being perpetual life, or life for a term of years, though all the original natural persons who were

first so organized die or sell out, or otherwise cease to be stockholders therein. So the bank lived when it got this money, and as a living entity it was endorsed by this surety. If, in the contract which passed the stock out of the old into the new holders, there was any trade whereby the old assets were disposed of, and the new holders did not make deposits into the bank of enough cash to comply with their obligations, it is enough to say that the governor had no notice thereof, so far as this record shows, and, at all events, nothing accessible to him which was not to this surety. He had knowledge that the old officers were out, and signed as surety for the bank, when Samuel was its president, and the stock was all in his hands and that of the new stockholders.

5. But it is alleged further that the surety is responsible only for the money deposited in the bank by the tax collectors of those counties designated by the governor to pay the funds they collected into that depository, and not for other funds deposited there by the treasurer of the state. By section 943 (f) of the Code it is enacted that the tax collectors so designated need not pay into the bank depository, but may pay directly into the treasury, and that the treasurer shall not make a deposit with any other bank than those established by the act of 1879, from which the section was codified, most clearly allowing that officer to make other deposits in either of those banks. Moreover, the obligation of this surety is to see that the bank makes a faithful account of all the public money or effects received by it. Code, §943 (d). Anything received by it from the state, within the meaning of public money or effects, is included in this obligation; and surely public money received from the treasurer is so included. The bond follows the statute, and really enlarges the obligation thus imposed by the statute of 1879. So that there is nothing in this point.

6. Nor is more in the point that the returns made to the governor were not strictly according to law. To account

for this money deposited with this bank, this surety indorsed that this bank would do so. How is he relieved because the annual returns were not regular and strictly in accordance with law? Suppose the governor ought, in rigid and close discharge of duty, to have removed the state funds or removed the bank as a depository, how does this dereliction of duty on his part relieve the surety? His emphatic obligation is to be accountable as long as it continues a depository, and not to be discharged when the governor ought to remove or discontinue it as a depository, or take the funds from it. All that, by the act which made part of the bond, was left by his contract with the state to the discretion and judgment of the chief magistrate, and his want of discretion or failure to exercise it wisely and with sound judgment, cannot excuse the surety from his bond. And so we think in regard to all the other points made in the bill of complainant, until we come to that on which the new trial was granted in the other cases, and on which it would seem that the chancellor rested the grant of this injunction.

In the case in which Simpson & Ledbetter were claimants, we have already considered the points made in respect to the invalidity of this bond as a valid statutory bond, and reference is made to the opinion in that case for the reason why it is held valid. The facts are the same here as there, except that in this record it appears that the bond was not actually recorded on the minutes of the executive department, but was referred to in the executive orders there recorded appointing this bank, etc.; but that opinion virtually concludes the point, even if not recorded.

7. Thus we are brought to the last point, that on which the injunction was granted, the effect of the forgery of Mrs. Deason's signature to the bond upon the rights of this surety. And really that is the only point upon which serious doubt can rest. Taking the sworn allegations in the bill and the amendment for true. is this surety dis-

charged from his obligation to respond by reason of that alleged forgery? We have carefully examined the law thereon in the light of numerous authorities, and extracting from those authorities what we believe principle as well as the stronger current of authority fix as the law on the facts here alleged, we will apply that law to the facts, and thus see whether or not there is ground for equitable relief, and therefore for the grant of this writ of injunction.

The facts are most strongly presented in the amendment to the original bill. Substantially they are, that complainant signed the bond on the understanding and condition that Frost, Samuel, Prentice and M. P. Deason would sign it as co-sureties; that, as evidence of this fact, the names of these persons were written and inserted in the bond before complainant's name, when it was presented to him for execution by him, and that he would not have signed it but for that understanding; that at the same time that the bond was presented for his signature, there was presented and shown to him another paper, attached to the bond, purporting to be an affidavit signed before a notary public, in which these co-sureties were represented as worth, Frost $50,000, Samuel $35,000, Prentice $25,000 and M. P. Deason $10,000; that, upon the strength of these affidavits and the understanding that they would sign the bond, he then signed the affidavit and bond, and would not otherwise have done so; that Prentice was not worth the amount opposite his name, as thus falsely and fraudulently represented to him; that he learned from the affidavit and bond that both Prentice and Deason would sign the bond, and therefore signed it, and would not otherwise have done so; that, when he signed it, he left it with Samuel for the purpose of procuring the signature of Prentice and Deason; that it was left with him on condition that it should be signed by the others before delivery to the obligee, and that thus Samuel held the bond as an escrow for the purpose aforesaid, and had no authority to deliver it to the obligee until executed by Prentice and Deason;

that up to May, 1883, he believed they had signed the affidavit and the bond, but on that day he heard a rumor that it had not been so signed, and now has ascertained and charges that neither signed the affidavit, and M. P. Deason did not sign the bond nor authorize any one else to sign for her; that these signatures are not the acts and deeds of either Prentice or Deason, but made without their consent or authority; that J. W. & W. L. Smith have bought property from Deason, naming and describing it, and that Simpson & Ledbetter have bought from Samuel, describing it, neither having notice of the fact that either were sureties, and thus the former got good title from the forgery, and the latter as innocent purchasers without notice; that therefore he, the complainant, is relieved as surety on the bond.

These facts make this case: Where a surety or a bond given to the state as security for a bank depository signs it before another surety, whose name precedes his in the body of the bond, and is forged thereto in the signature, and where the name of the same person, as well as that of another, whose name appears before complainant's in the body of the bond, appears as having signed an affidavit that they were worth a certain sum, and never made the affidavit at all, but their names were forged to it, and the complainant surety entrusts the bond to the president of the bank as an escrow, not to be delivered to the state until these sureties execute the bond, but the president of the bank does deliver it to the governor, the obligee, with all the signatures apparently genuine thereon, is the complainant surety, in such a case, relieved and discharged from responding to the state, on the breach of the bond by the bank?

In 16 Wallace, 1, the case of Dair *vs.* The United States, it was held that a bond, perfect on its face, apparently duly executed by all whose names appear thereto, purporting to be signed and delivered, and actually delivered without a stipulation, cannot be avoided by the sureties, upon

v 72-35

the ground that they signed it on a condition that it should not be delivered, unless it was executed by other persons, who did not execute it, where it appears that the obligee had no notice of such condition, and there was nothing to put him upon inquiry as to the manner of its execution, and that he had been induced to act upon the faith of such bond to his own prejudice.

That case, in principle, covers this. The only difference in fact is that in that case the persons who agreed to become sureties did not sign the bond as such, and their names were not in the body of the instrument, so as to put the agent of the government on notice or inquiry that something was wrong; whereas, in the case before us, the name of her, who apparently signed, but, according to the allegation and proof by the complainant, did not really sign, was in the face of the bond. It appeared just as genuine in the signature as in the face of the bond, in the case at bar. There was nothing to put the governor on notice or inquiry, but on the paper, the face of the bond, and signatures and witness, everything looked genuine. Mrs. Deason's name was in the face of the bond, but it was also in the signature, to the bond. The point on which Mr. Justice Davis, in Dair *vs.* United States, placed the judgment in that case was, that there was nothing to put the government's agent on inquiry, and he distinguished that case from the case decided by Chief Justice Marshall, in Pauling *vs.* United States, 4 Cranch, 219 ; that in the latter case, the persons whose names were in the body of the bond did not sign, and the agent was put on inquiry to ascertain why they had not signed, and thus the government was not innocent. The decision rests on the principle, as old as Lord Holt, who said in 1 Salk., 289, "Seeing somebody must be a loser by this deceit, it is more reason that he that employs and put a trust and confidence in the deceiver should be a loser than a stranger," and which is now embodied in the familiar principle that, of two innocent persons, he who enabled a wrong-doer to do

the wrong should suffer, rather than the other, who put no trust in him, and gave him, by that confidence, no power to do the wrong.

In the case at bar, Morgan is innocent of this forgery, if there was one; so is the governor equally innocent; but Morgan gave the bond to Samuel to be executed by the other sureties, and thus put it in Samuel's power to palm off upon the governor a forged signature as genuine. Instead of carrying out what Morgan expected him to do, he delivered the bond to the governor, not genuinely executed, but forged by somebody, so far as Mrs. Deason was concerned. In Dair vs. The United States, the sureties were held to be estopped from setting up the fact that they signed on the express stipulation that others should sign, because there was nothing to put the agent of the government on inquiry, the names of the others not being in the face of the bond, and the agent acted, and the government acted to its injury, without being affected with notice directly or indirectly, the sureties having put it in the principal's power to do the wrong on which the government acted to its damage. So here the surety, Morgan, put it in the power of Samuel, the president of the bank and principal's agent, to palm off, as genuine, a forged signature upon the state's agent, the governor, when nothing appeared on the face of the bond, or otherwise, to give the governor the slightest notice, or put him on inquiry, that any signature was otherwise than perfectly genuine; and this surety, too, must be estopped on the same principle.

As the court says in the case of Dair vs. The United States, there seems to be a "conflict of opinion in the courts of this county upon this point," but we conclude, as that court unanimously did, that the decision is "sustained by the weight of authority," and repeat what it said that, "at any rate, it is clear, on principle, that the doctrine of estoppel *in pais* should be applied to this defence." In that case the court cite 53 Maine, 284; 31 Ind., 76, and

2 Metcalf, 608. To those cases we add 63 Mo, 212, where all the cases seem to be thoroughly considered and reviewed, especially 52 Mo., 75, cited by defendant in error here, which is greatly modified, if not, in effect, overruled. That court, in the 63 Mo., conclude that "the agreement of a surety with his principal that the latter shall not deliver a bond till the signature of another be procured as a co-surety, will not relieve the surety of his liability on the bond, although the co-surety is not obtained, where there is nothing on the face of the bond, or in the attending circumstances, to apprise the taker that such further signature was called for, in order to complete the instrument. In such case the surety, having invested his principal with apparent authority to deliver the bond, is estopped from denying his obligation to the innocent holder." See also 41 N. J., 403, and 64 Mo., 167. In the last named case, the principle was applied to a forged signature of one who was to be a co-surety, and covers fully the case at bar. See, too, 6 Gray, 90, and Brandt on Suretyships and Guaranty, 358, and cases there cited.

Indeed, since the adjudication in *Lewis et al. vs. The Board of Commissioners of Roads and Revenues*, 70 Ga., 486, the question is hardly an open one in this court. There we held that, " to permit these sureties, after the bond has been executed and returned, and the commission issued to their principal, who has acted under it, and received and failed to account for the public revenue, to set up as a defence to a proceeding founded on such default, that they stated to the ordinary, who took the bond, that they would not be liable till certain others signed it, would be to allow them to take advantage of their own wrong. They are estopped from so doing." That case is stronger than this, in that the ordinary was the officer or agent to take the bond; but as the governor approved it, and issued the commission, and it was not claimed that " the alleged conditional execution of the bond was ever made known to

him," we held the sureties estopped. See also the author-
ities cited and considered in that case.

So we conclude that, however hard this case may bear
upon Mr. Morgan, who was made a sufferer by the con-
duct of the man whom he trusted, and whose surety he
really became, as the bank could procure none except
through its officers, of whom Samuel was the chief, yet as
the state, through its officer, was also perfectly innocent
and Morgan put it in the power of Samuel to deceive the
state to its great hurt, having acted and put its money in
this bank on the strength of this bond, and lost it, we
must hold him estopped from setting up this defence.

We do not see that the affidavit and forgeries thereon
affect the case, as the law requires no justification on the
part of any surety, and especially as the governor was
equally ignorant of all that conduct; nor do we see how
the order in which the sureties' names appear in the face
of the bond affect it. The signature of Morgan precedes.
the forged signature. Upon the whole case, we conclude
that the facts set up, viewing them as true, as set up and
proved by complainant's own deposition, and those of
others sworn on his behalf, make no ground in equity for
his relief, and, therefore, that the injunction was improp-
erly and illegally granted.

Judgment reversed.

For citations by plaintiff in error. see *The State vs.*
*Simpson & Ledbetter, supra.*

Cited for defendants in error, in addition to what is
cited there : 1 Kelly, 582 ; 18 *Ga.*, 47 ; 33 *Id.*, 332 ; 6 *Id.*,
552, 302 ; 66 *Id.*, 409 ; 29 *Id.*, 399, 441 ; 36 *Id.*, 669 ; 54
*Id.*, 635 ; 17 *Id.*, 47 ; 57 *Id.*, 346 ; 6 *Id.*, 202 ; 10 *Id.*, 414 ;
11 *Id.*, 286 ; 13 *Id.*, 61 ; 17 *Id.*, 111 ; Code, §§945, 2181 ;
943 (a) ; 2199, 3174–5 ; 3 Wash. C. C. R., 70 ; 1 Story Eq.,
215, 283 ; 19 Am. R., 53 ; 25 *Id.*, 703 ; 28 Am. Dec., 679 ;
Cooley on Tax, 506 ; 21 Wall., 657 ; 10 Humph., 122 ; 14.
Am. R., 389 ; 52 Mo., 75 ; Field on Corp., 286 ; 53 Mo., 516.