The State, *ex rel.* McCarty, Auditor of State, *v.* Pepper and Others.

THE STATE, on the relation of McCARTY, Auditor of State, *v.* PEPPER and Others.

ESTOPPEL IN PAIS.—Where an act is done or a statement made by a person, which cannot be contradicted or contravened without fraud on his part and injury to others whose conduct has been influenced by the act or admission, the character of an estoppel will attach to what would otherwise be mere evidence; the estoppel being limited within such bounds as are sufficient to put those who have dealt on the faith of appearances that turn out to be incorrect in the same position with reference to the author of such appearances as if they were true.

SAME.—*Principal and Surety.—Bond.*—When a bond has been signed and delivered to the principal obligor by a surety, upon the condition that others, not named in the instrument, shall sign before it is delivered to the obligee, and it is delivered without such signatures being obtained, and received by the obligee without notice of such condition or circumstances which should put him upon inquiry, the condition imposed will not avail the surety. This is not a question of the power of the principal to deliver the bond in its apparently perfect condition, but simply a question of estoppel.

SAME.—*Blanks.*—A surety signing and delivering to the principal obligor a bond before the names of the sureties have been inserted in the body of the instrument will be held as agreeing that the blank for such names may be filled after he has executed it.

SAME.—*Signing after Forged Signature.*—A surety signed a county treasurer's official bond, at the request of the principal obligor, after the signatures of other sureties, without reading it, or hearing it read, or asking what it was, upon being told by the principal that it was a county paper.

*Held,* that such surety was not released by the fact that one of the signatures before his was forged.

AGENCY.— *Official Bond.*—The principal obligor in a county treasurer's official bond is not the agent of the board of county commissioners in procuring its execution.

APPEAL from the Franklin Circuit Court.

RAY, J.—This was an action upon the official bond of Michael Batzner, Treasurer of Franklin county, for a failure to pay over money collected for the State as such treasurer.

There was an answer.in five paragraphs.

The first is a general *non est factum*, putting in issue the execution and delivery of the bond.

The second sets up the fact of the supposed bond being intrusted to a special agent for the special purpose only of delivering this supposed bond when certain conditions should be complied with; and that he fraudulently handed the supposed bond over to the obligee without authority.

There is a third issue of fact, that after the supposed bond had been delivered to the obligee there were material alterations made in it, without the knowledge or consent of the obligors, which avoided the bond.

There is a fourth issue upon the plea of those who signed after the bond was delivered to the obligee, that they were induced to sign and deliver it by fraud; that they would not have signed or delivered it if they had known that it had before been delivered; and that their signing made a material alteration in it, unknown to them, after delivery.

The fifth issue of fact is, that when the bond was delivered by the obligors, they all, except Batzner and Grinkemeyer, supposed that the signatures of all the obligors who purported to have signed it were genuine; and if they had known that any of the signatures were forged, they would not have delivered the bond; whereas, in fact, one of the signatures, that of Grinkemeyer, was not genuine, but a forgery.

The cause was submitted to the court for trial, and there was a finding for the defendants.

The appellees make the following abstract of the main part of the evidence.

*Grinkemeyer* testifies as follows: "That he did not sign the bond, or authorize any one to do it for him." (Judg-

ment has been rendered in his favor upon the ground that his signature was a forgery.)

*Clark.*—"Batzner wanted me to sign the bond. I told him he knew that I was embarrassed, and could do him no good. He said he wanted to get one hundred names on the bond, and my name might induce others to sign it. I was at the time insolvent."

*Pepper.*—"Batzner asked me to sign his bond, and said he must or would have one hundred names on it. Can not say which. I put my name there because he said he must or would have one hundred names on it."

*Koerner.*—"Batzner asked me to sign my name to his bond. He said I need not be afraid, he wanted to get the whole county on it, and then I signed my name. I signed the bond because I thought if he got so many on it there could be no danger."

*Schmidt.*—"Batzner asked me to sign his bond. I told him I did not know about it. He asked me why. I said he might get a big pile of money on hand and run away and leave us to pay it. He said I need not be afraid, that he intended to get one hundred good names on it. I saw Fiske sign it; and I then signed it."

*Oltel.*—"Batzner asked me to sign my name. I told him that it was of no use, that I had no property. He said that made no difference, that it was just for fun. He said that so the paper was full it was right. I did not read it, nor did he read it to me. I thought I was just signing for the character of the man. I can not read English. He did not tell me what it was for; I supposed it was for the character of the man. I had no property at the time."

*Walter.*—"Batzner brought the paper to me; I hesitated; he said I need not be afraid, he intended to get one hundred good names on it."

*Shroeder.*—"Batzner handed me the paper, and asked me to sign it. I told him I did not like to sign it. He said he had to have one hundred good names on it, and on this consideration I signed it."

*Calfee.*—"Batzner asked me to sign his bond. I told him I had always avoided such matters. He spoke of our acquaintance, &c., and said if I would put my name down he would get one hundred good names to go on the bond, and spoke about the township he intended to get them in. I then put my name down with these inducements."

*Quick.*—"Batzner asked me to sign his bond. I told him he could get enough without me. He said he intended to get one hundred names before he presented it to the Board."

*Witt.*—"Have lived in this county twenty-three years. Knew Batzner. I signed the bond at my house; Batzner brought a paper to me; I didn't ask what it was, but signed it; didn't read it; Batzner said, Here, Witt, is a county paper, sign it. I didn't ask him what it was, but signed it; he didn't read it to me."

*Martin.*—"Batzner asked me to sign the paper. I asked him what it was for. He told me it was for his treasurer's bond. I hesitated; and he then told me I need have no fears, for he would have one hundred good men on it before he attempted to file it."

*Alther.*—"Batzner told me he wanted me to sign the bond. I told him to get richer men, I was too poor to go on a bond for so much money. He said I ought not to be afraid, that there was one man on the bond that was worth fifty thousand dollars; that he would not get less than two hundred names on the bond, and on this consideration I signed the bond."

*Johnson.*—"Batzner asked me to sign the bond. I told him my name would do no good; he said he wanted to get one hundred names on the bond."

*Moorman.*—"Was sheriff, &c. Saw the bond the day the commissioners met. They met in the auditors's office. There was no court in session. There was a blank in the body of the bond—no names except Batzner's, nor any date to it. The blank was filled up after it was approved, by Archy Herndon, by the insertion of the names of the sureties."

*Buckingham.*—"Batzner asked me if Mr. D. D. Jones had seen me about his surety bond. I told him he had. I asked him if Mr. Jones and Dr. George Berry had signed it. He said they had not, but were going to; that he had been to see Dr. Berry, and he had promised to come and sign the bond; * * * that he intended to get one hundred names, the best men in the county. I then signed the bond. * * * I asked if Dr. Berry and Dan Jones were certain to go on the bond. He said they were. I was induced to sign the bond by these statements, and knowing that Jones and Berry were leading men in the county and were well acquainted. * * * My understanding was, that he, Batzner, was to get the names before the commissioners met, and the bond was then to go to the commissioners."

*Berry.*—"Batzner asked me to sign the bond. I asked him if he had redeemed his pledge he had made as to the number of men to be on the bond, which was, that he should have one hundred good men on the bond. He said he had not, but would get them. I told him to get ninety-nine, and I would be the hundredth. I did not then sign the bond. The day I signed it he came to me * * and pressed my signing it. I asked him if he had got the names, and he said he had not, but intended to get them. I told him that was his pledge, and I did not want to go on until he had got them. He said he wanted to get some names in the country, and did not want to go to get them until he had got the names of his acquaintances in town. I told him I would sign with the understanding that I was to be on if there were one hundred good names on the bond. I signed it and left it with him with that understanding. I left it with him, to be delivered when he got one hundred good men on it."

*Shafer.*—"Batzner came back with a paper in his hand, and asked me if I did not want to sign it. I asked him, 'For what?' He said he wanted one hundred men on it for rec-

MAY TERM, 1869. 81

The State, *ex rel.* McCarty, Auditor of State, *v.* Pepper and Others.

ommendation. He said, 'You must not be afraid to sign your name.' I said, if it was nothing else but a recommendation, I would do it. I did not read it; it was folded up. I saw nothing written or printed on it. He did not read it to me. I can't read English. I did not ask him to read it to me; did not know it was a bond; saw no names on it; would not have signed it had I known it was a bond. He did not speak of any other paper, or names to a paper, until after I had signed it. During that evening he told me he had a bond filled out at Brookville, with sixty names on it."

*Stoops.*—"I was one of the commissioners at the time this bond was approved, and was in attendance. It was a special meeting, called to approve the bonds. When it was first presented, I objected that there were not names enough on it. Batzner took it out and got King, West, and others to sign it. Don't recollect whether Grinkemeyer's name was on when he brought it back, or not; can't say whether it had been filled up with names and dates at the time he brought it back, or not."

*Hyatt.*—"I was commissioner when this bond was approved, and was present when first presented; it was rejected, only a portion of these names being on it; the balance of signatures were procured the same day, and within a short time. Think that after it was objected to, all the names from Johnson down were put on it. Grinkemeyer's name was brought in; it had not been on before. Don't know whether it was filled up before approval, or not. When first presented, the bond was objected to. Batzner took it out and got on the name of Johnson and those below it."

The question presented in this court is upon the sufficiency of the evidence to sustain the finding.

In the case of *Deardorff* v. *Foresman*, 24 Ind. 481, the question presented in this case upon the liability of the sureties where the bond was delivered by them to the principal upon condition that others, not named in the bond, should sign before the bond was delivered to the obligee,

Vol. XXXI.—6

and such delivery was made without such signatures being obtained, and the bond received by the obligee in good faith, was examined; and it was held, that where "the surety places the instrument, perfect upon its face, in the hands of the proper person to pass it to the obligee, the law justly holds that the apparent authority with which the surety has clothed him shall be regarded as the real authority; and as the condition imposed upon the delivery was unknown to the obligee, therefore the benefit of such condition shall not avail the surety." This decision was affirmed in *Webb* v. *Baird*, 27 Ind. 368, and in *Blackwell* v. *The State*, 26 Ind. 204, where it was also held, that the principal obligor was not the agent of the board of commissioners.

This entirely disposes of the plea of a special agency. The special agent is clothed with the apparent authority to make an unconditional delivery of the bond, and the obligee, uninformed of the condition imposed, is authorized to receive the bond thus delivered. Nothing short of absolute notice to the obligee, or circumstances which should put him upon inquiry and therefore imply notice, can avoid this rule. It is not, as stated in *The People* v. *Bostwick*, 32 N. Y. 445, a question of the power of the principal to deliver the bond in its apparently perfect condition, but simply a question of estoppel. The surety signs an instrument complete on its face, and delivers it to the principal to pass over to the obligee; if he impose any condition upon his delivery, he must rely upon the principal to execute that condition, for he has made him his agent for the general purpose of a delivery, and has clothed him with the *indicia* of such agency. The obligee accepts an instrument perfect in form and execution, which comes to him from the person who should have possession of the instrument for the purpose of such delivery. The entire transaction, so far as the obligee is involved, is according to the ordinary and natural course. The surety, however, while he executes the instrument and places it in the usual channel for delivery, departs from the ordinary course of proceedure by circum-

scribing the general authority by a condition unknown to the obligee. The condition is disregarded, a fraud is accomplished, and he who has not scrupled to trust his principal with the semblance of a general authority to make the delivery must stand the hazard he has incurred.

A much broader scope has been given to the doctrine of estoppels *in pais*, both in this country and in England, than formerly obtained, and it is now established, that whenever an act is done or a statement made by a party, which cannot be contradicted or contravened without fraud on his part and injury to others whose conduct has been influenced by the act or admission, the character of an estoppel will attach to what would otherwise be mere evidence. The estoppel must obviously be limited within such bounds as are sufficient to put the party who has dealt on the faith of appearances that turn out to be incorrect in the same position with reference to the author of such appearances as if they were true. The truth is, courts have been, for some time, favorable to the utility of the doctrine of estoppels, hostile to its technicality. 2 Smith Lead. Cas. 619 (6th Am. ed.); *Smith* v. *Newton*, 38 Ill. 230; *Knoebel* v. *Kircher*, 33 Ill. 308.

It is intimated by Judge REDFIELD, in a note to the case of *The York Co. M. F. Ins. Co.* v. *Brooks*, 3 Am. Law Reg. (N. S.) 403, that the English courts have denied the application of the rule to this class of cases, that he who by his culpably negligent act enables his agent to commit a fraud to the prejudice of third persons, is estopped from denying the actual authority of the agent; and the cases of *Swan* v. *The North British, &c., Co.*, 10 Jur. (N. S.) 102, and *Patching* v. *Dubbins*, 23 Eng. L. & Eq. 609, are cited as authority for the remark. In the case of *Deardorff* v. *Foresman, supra*, we examined the first case cited, and the result proved that his conclusion was not sustained by that authority. The case of *Patching* v. *Dubbins* was where a vendor of land covenanted, that no building except tombs should be erected on any part of his land opposite to the land sold. Subsequently the vendor sold part of the land

on the other side of the road, and the purchaser built there-on. No objection was made to the building erected, as it did not intercept the view of the first vendee. Subsequently another part of the land was sold, and buildings were about to be erected, when the original purchaser filed a bill to enjoin the building; but the court dismissed the bill, hold-ing that the true meaning of the covenant was, that it ex-tended only to so much of the lands of the original vendor as were exactly opposite to the land sold to the plaintiff. If this decision is a denial of the application made in this country of the rule referred to, the English Court of Appeal in Chancery has evinced so much delicate consideration for the American courts that its line of departure from their rulings cannot be traced.

But since the decision of this court in the *Deardorff* case, the question there considered has been before the Supreme Court of the State of Maine, and has received a like solu-tion. *State* v. *Peck,* 53 Me. 284. This decision, published the year following the case in this court, reviewing, as it does, the same line of authorities, supporting itself by the same decisions and arguments that approved themselves to us, renders it unnecessary that we should do more than quote the result reached: "A bond perfect upon its face, ap-parently duly executed by all whose names appear therein, purporting to be signed, sealed, and delivered by the sev-eral obligors, and actually delivered by the principal with-out stipulation, reservation, or condition, cannot be avoided by the sureties upon the ground that they signed it on the condition that it should not be delivered unless it should be executed by other persons, who did not execute it, when it appears that the obligee had no notice of such condition, and nothing to put him upon inquiry as to the manner of its execution, and also that he has been induced upon the faith of such bond to act to his own prejudice."

Before passing from this portion of the case it may be well to add a remark to our comments made in the *Deardorff* case upon the decision in the Supreme Court of the United

States in *Pawling* v. *The United States*, 4 Cranch, 218. The action was upon an official bond given by Ballinger and signed by Pawling, Todd, Adair, and Kennedy, as his sureties, who pleaded that they delivered the same as an *escrow* to one Joseph Ballinger to be safely kept, upon condition that if Simon Ingleman and William Patton, *named on the face of the bond*, should execute the same as co-sureties, then the bond should be delivered to the agent of the United States; otherwise not. There was an issue upon this averment of a delivery as an *escrow*, and the question was presented to the court upon a demurrer to the evidence introduced by the defendants. Without commenting upon the allegation, that an instrument not fully executed was delivered as an *escrow*, we cite a paragraph from the opinion of Chief Justice MARSHALL: "It is also of some importance that the defendant Todd had previously declared that he should not be apprehensive of becoming a security for Ballinger, provided others, whom he named, should also become securities, and that he inserted the names of others in the bond, in the presence of the witness."

When it is considered that this is the original decision upon which all the cases rest that assume to release the surety from liability when the name of his co-surety does not appear on the face of the instrument, the entire want of authority to justify their departure from sound principle can be appreciated.

The evidence in the case in judgment did not authorize the finding that the sureties were released because others did not sign the bond as co-sureties.

There remain but two questions. Of these, there can be nothing predicated on the fact that the bond was not accepted upon its first presentation to the board of commissioners. No formal action was taken by the board at that time, but it remained in session to act upon the bond when presented, and the names of the sureties were left blank in the body of the instrument for the very purpose of procuring names sufficient to satisfy the board. A party signing

and delivering an instrument in this condition must be held as agreeing that the blanks may be thus filled after he has executed it; and the evidence introduced shows full authority given to the principal to procure such signatures as he secured.    *Inhabitants of South Berwick* v. *Huntress,* 53 Me. 89; *Smith* v. *Crooker,* 5 Mass. 538; *Hudson* v. *Revett,* 5 Bing. 368; *Eagleton* v. *Gutteridge,* 11 M. & W. 465.

The rule as stated in 1 White & T. Lead. Cas., 157, in the note to *Dering* v. *Earl of Winchelsea,* is, that "where a note with the names of certain persons upon it, who stood in the relation of co-sureties for the maker, has been offered for discount, and not being satisfactory, the name of another person has been procured, who also becomes a surety for the maker, all these persons are co-sureties with one another, and subject to mutual contribution, though the earliest sureties had no knowledge of the last's becoming a surety." The cases fully sustain this doctrine.    *Stout* v. *Vause,* 1 Rob. (Va.) 169; *Warner* v. *Price,* 3 Wend. 397; *Norton* v. *Coons,* 3 Denio, 130; S. C. 2 Seld. 33; *Woodworth* v. *Bowers,* 5 Ind. 277; *Sisson* v. *Barrett,* 6 Barb. 199; S. C. 2 Comst. 406; *M'Neil* v. *Sanford,* 3. B. Mon. 11.

The cases of *Oneale* v. *Long,* 4 Cranch 60, and *Harper* v. *The State,* 7 Blackf. 61, if to be sustained, must rest on the fact that a perfect instrument had been delivered by the original sureties, fully executed and filled up, and that the names of other sureties were afterward inserted in the body of the instrument without the consent of such original sureties, in disregard of the technical rule at common law concerning the alteration of sealed instruments.    Here the space was left blank for the very purpose of inserting the names of all who might sign the bond, and this common law restriction does not exist under our statute.

The name of Grinkemeyer, however, was forged to the bond; but this was the last name signed, except that of Witt; and as the signatures preceeding that of Grinkemeyer were in no way procured by the forgery, they cannot be re-

The State, *ex rel.* McCarty, Auditor of State, *v.* Pepper and Others.

leased thereby. The supreme confidence evinced by Witt in "county papers" will relieve him from any suspicion of having been influenced to sign by any preceding names. Indeed, there are cases which would hold him as affirming the genuineness of the preceding signatures. *York Co. M. F. Ins. Co.* v. *Brooks, supra;* *Terry* v. *Hazlewood,* 1 Duvall, 104.

The former decision in this case, in 22 Ind. 399, is overruled, for the reasons given in *Deardorff* v. *Foresman, Blackwell* v. *The State, Webb* v. *Baird, supra,* and by the decision herein. It should have been regarded by our courts as overruled by the first two cases cited.

The judgment is reversed, with costs, and the cause remanded for a new trial.

ON PETITION FOR REHEARING.

FRAZER, J.—In considering the application for a rehearing, we have not thought it necessary or useful to re-examine the doctrine declared in the original opinion, and in the former case of *Deardorff* v. *Foresman.* That subject had been examined by all the judges in consultation, to the extent of a critical inspection (to a considerable extent repeated) of the cases cited, and of those referred to by all other courts as supporting the ruling of this court in this cause when formerly here. The result has been, not only a clear conviction on the part of the whole bench, as expressed in the opinions in this and the *Deardorff* case, but also a wonder how, upon a thorough examination of the subject, any other conclusion could be arrived at.

A suggestion in the petition for rehearing seems to call for notice. It is, that the estoppel was not pleaded. But it could not properly be pleaded. The answers were mere denials, direct or argumentative, of the execution of the bond, and no reply was necessary or proper. The estoppel could not be pleaded, and might properly go in evi-

dence.   Indeed, the facts creating it were put in evidence by the appellees themselves.

Petition overruled.

*G. Holland* and *C. C. Binkley,* for appellant.

*L. Barbour, J. D. Howland,* and *H. C. Hanna,* for appellees.