.Weldon, J.,
delivered the opinion of the court:
The claimant was consul of the United States at Hong-Kong froip the 4th day of February, 1879, to the 21st of July, 1885, and during that time, as he alleges, he received a large amount of unofficial fees, which were paid into the Treasury of the United States; and this suit was instituted, and is now prosecuted, to recover against the defendants a judgment for said fees. The claim embraces six items:
u (1) For examining Chinese emigrants departing in foreign vessels to the United States, $5,147.
“(2) For certifying extra copies of quadruple invoices, $2,000.
“ (3) For certifying invoices of goods in transit through the United States to other countries, $5,805.
“ (4) For notarial and clerical work, $644.01.
“(5) For services to foreign-built vessels carrying the American flag, $584.
<£ (6) For certifying invoices for goods exported to the United States which were on the free list and for which no invoice was required by law as a condition of entry, $15,000.”
In the trial of the cause several questions of law were discussed, and which become important in the decision of the controversy. It is insisted, by way of argument against the plaintiff’s right to recover, that the statute of limitations had run when the suit was commenced; and that therefore the petition should be dismissed. As has been said in many decisions of this court, the statute of limitations is always applicable to a proceeding within the general jurisdiction of the court, *6 whether pleaded or not. Eevised Statutes, section 1069; provides :
“Every claim against the United States cognizable by the Court of Claims shall be forever barred, unless the petition setting forth a statement thereof is filed * * * within six.y ears after the claim first accrues.”
To this general rule of limitation the law contains several exceptions, among which is one in favor of a person “beyond the seas” when the claim accrued.
A person thus situated is entitled to a further limitation of three years after the disability has ceased within which suit may be brought. The findings show that the claimant continued to discharge the duties of consul at Hong-Koug until July, 1885; and that place being beyond the seas, the three years prescribed by the exception did not expire until July, 1888.
The contention arises as to what are official,fees within the meaning of the law. The statute lying at the foundation of the controversy is as follows (Rev. Stat., § 1745):
“The President is authorized to prescribe from time to time the rates or tariffs of fees to be charged for official services, and to designate what shall be regarded as official services, besides such as are expressly declared by law in the business of the several legations, consulates, and commercial agencies, and to adapt the same, by such differences as may be. necessary or proper, to each legation, consulate, or commercial agency; and it shall be the duty of all officers and persons connected with such legations, consulates, or commercial agencies to collect for such official services such and only such fees as may be prescribed for their respective legations, consulates, and commercial agencies, and such rates or tariffs shall be reported annually to Congress.”
By this law the President is authorized not only to prescribe what shall be charged for a given service, but also “to designate what shall be regarded as official services.” Not only is the compensation in amount within the jurisdiction of the President, but the quality of the service, as to whether it shall be official or not official, is within the discretion and power of the Executive. This is true as to such fees as are not specifically disposed of by the terms of positive law, because we find in this section a classification of fees “ such as are expressly declared by law.” There is no claim on the part of the defense *7 that all the fees sued for belong to that class of fees which “are expressly declared by law.” We must then determine whether the fees collected by the claimant and paid into the Treasury are official fees within the meaning of the law, as affected by the-actionof the President and the statute.
The issue mainly turns upon the legal effect of the consular regulations in force during the performance of the services of ’the claimant, and if by those regulations the services charged for were official, then the payment into the Treasury was in pursuance of law, and there can be no recovery. The immediate predecessor of the claimant, by the employment of a third party, retained as expenses the fees collected from foreign ships for examination under the laws of the United States in relation to immigration ; and among the first acts of the claimant when he became consul at Hong-Kong, was to open communication with the State Department in relation to his fees, and more especially those under section 2162, Eevised Statutes.
It is not necessary to notice in detail the controversy between the claimant and the Department upon that subject; it is sufficient to note that they differed as to the rights of the parties to this suit, under existing law and regulations. In order to avoid a conflict with the Government at that time the claimant accounted for all the disputed fees, not conceding the right of the Government to demand or retain them; and while he did not formally protest against the payment, he asserted such a right to the fees (if he would be otherwise bound) as does in law protect him in his claim to maintain a suit without being subjected to the consequences of an estoppel.
“Estoppels are similar in strictness to forfeitures and the enforcement of penalties. They are not favored defenses when the technicality of the estoppel can not be subordinated to its equity.” (Andrews v. Lyons, 11 Allen, 349; Lonesberry v.Depew, 28 Barbour, 44; Water’s Appeal, 35 Pa. St., 523; Babcock v. Parry, 8 Ohio St., 270; State v. Pepper, 31 Ind., 76; Cape Ann Granite Co. v. U. S., 20 C. Cls. R., 1.)
“An estoppel in pais operates only-in favor of a person who has been misled inhisinjury, andhe only can setitup.” (Ketchum v. Duncan, 96 U. S. R., 659.)
Public officers (upon the question of their compensation and the payment of money into the Treasury) are not bound, in order to save their rights, to place themselves in antagonism *8 to the accounting officers of tlie Department; suffer themselves to be sued, and incur the odium, for the time, of being in default; but have the right to pay into the Treasury the disputed moneys, and then seek the courts to adjust and determine their claims against their superior and sovereign.
If every payment of a disputed sum involves an estoppel against the officer, the party would be bound to assume the responsibility of litigating with the Government in the character of a defendant, instead of being in the preferable position of claimant.
No person has been misled by the act of the party in the payment of the disputed fees. No interest of the Government has suffered by the acquiescence of the claimant, for the time ■being, in the construction of the Department of the law of consular service. No rights have become vested upon the faith of his acts, and no wrong can be done by the judicial investigation and determination of the issue presented by this record.
And while the claimant is not to be prejudiced by his course, the officers of the Department are not to be criticised for their vigilance and care in the protection of the rights of the defendant in the investigations and decision of claims against the Government. If they pay money unauthorized by law, that may be the end of the transaction, while if they withhold money when they are in doubt, the party has a speedy and efficient remedy in the courts to determine his rights.
“A paym en t into the Treasury of all fees and collections made by a collector under the authoritative requirement of the Department is not a voluntary payment, though made without protest, and does not prevent him from suing to recover back his percentage of the fees, etc.” (Lawson’s Case, 14 C. Cls. E., 332; affirmed, 104 U. S. R., 164.)
From the 4th day of February, 1879, to the 21st day of July, 1885, the claimant collected and paid to the United States the sum of $5,147 (excluding the amount refunded after the receipt of the communication of January 2, 1882) as fees for the examination of Chinese emigrants. Three thousand nine hundred and twenty-three dollars'and fifty cents were collected prior to September 1, 1881, and $1,223.50 between September 1,1881, and December 31, 1881.
Section 321, Consular Begulations of 1874, provides:
“All acts are to be regarded as official services ’ when the consul is required to use his seal and title officially, or either of *9 them; and the fees received therefor are to be accounted for to the Treasury of the United States.”
Section 333 of said regulations is entitled a “ tariff of fees,” and embraces one hundred and seven items, but none of the specifications defines the fee of the consul as to an examination of Chinese emigrants. In the regulations of 1881, under section 496, under a “ tariff of fees,” specification 35, it is provided :
“ To the examination required by section 2162 of the Eevised Statutes, for each emigrant (Art. XXI), 25 cents.”
This is the first time we find any specific mention of consular fees under said section of the law, although by article 227 of the regulations of 1874 consuls are called upon to prevent transportation of coolies in the,vessels of citizens of the United States, and to proceed against every American citizen engaged in trade in violation of section 2158 of the Eevised Statutes. (Consular Eegulations of 1874, p. 55.)
The sections of the statute upon which the contention is based are as follows :
“ Sec. 2158. No citizen of the United States, or foreigner coming into or residing within the same, shall, for himself or for any other person, either as master, factor, owner, or otherwise, build, equip, load, or otherwise prepare any vessel registered, enrolled, or licensed, in the United States, for the purpose of procuring from any port or place the subjects of China, Japan, or of any other oriental country, known as “coolies,” to be transported to any foreign port or place, to be disposed of, or sold, or transferred, for any time, as servants or apprentices, or to be held to service or labor.
“ Sec. 2162. Nothing herein contained shall be deemed to apply to any voluntary emigration of the subjects specified in section twenty-one hundred and fifty-eight, or to any vessel carrying such person as passenger on board the same, but a certificate shall be prepared and signed by the consul or consular agent of the United States residing at the port from which such vessel may take her departure, containing the name of such person, and setting forth the fact of his voluntary emigration from such port, which certificate shall be given to the master of such vessel, and the same shall not be given until such consul or consular agent is first personally satisfied by evidence of the truth of the facts therein contained.”
Section2158by its termsrefers to citizens of the United States or a foreigner coming into the United States or residing within the same, and to vessels “ registered, enrolled, or licensed in *10 the United States.” No reference is made to a foreign ship or the acts of foreigners except as connected with a vessel registered, enrolled, or licensed in the United States.
The purpose of this section is to prevent the “ cooly trade ” in so far as that can be done by regulating the conduct of citizens of the United States and a certain description of foreigners in relation to ships directly affected by the navigation laws of the United States. It may ’be that beyond that limit Congress had no right to go, but it is not necessary to discuss and determine the boundary of Congressional power in this connection.
By reference to the Consular Regulations of 1881, page 115, it will be seen that paragraph 347 is preceded by the words duties as to American vessels engaged in the transportation of Chinese and other immigrants.” Paragraph 347 then proceeds to state the illegality of certain transactions upon the part of citizens of the United States in relation to the emigration of Chinese. The whole of article 21 is devoted to the discussion as to tne mode in which the forced emigration of persons may be avoided or prevented on the vessels belonging to the citizens of the'United States, and no reference is made to ships which do not belong to citizens of this country.
In order to effect the purpose and policy of 2158, section 2162 was enacted. That voluntary emigration might not be obstructed, Congress provided that the consul or consular agent of the United States at the port of departure should make an examination of the crew so as to determine whether the emigration of all the passengers was voluntary or forced. Being satisfied that the law was not violated, the consul or consular agent was to certify for the master of the vessel that each emigrant was departing in the exercise of his free volition. Upon this section was framed the thirty-fifth specification of the four hundred and ninety-sixth section of the regulations of 1881, providing a fee of 25 cents for each emigrant.
Neither section 2162 of the statute nor classification 35 in the regulations of 1881 defines specifically the character of the ship to be examined by the consul; so we are remitted to the provisions of section 2158 to ascertain the kind of vessel on which the consul is to exercise the jurisdiction and power of search. It must be a ship having the characteristics enumerated in that section before the consul is required to make the examination *11 and before be has tbe right to perform tbe service of making a certificate. Tbe regulations of 1881 do not discriminate between American and foreign vessels, but simply provide a fee of 25 cents for every emigrant certified to under section 2162.
Full power is given the President under section 1745not only to fix tbe compensation of official fees, but also “ to designate what shall be regarded as official services.”
We do not find by an examination of either tbe regulations of 1874 or 1881 that the President has exercised tbe power “to designate ” as official service the examination of a ship not having tbe qualifications prescribed by section 2158. And as tbe law requiring examination does not apply to other vessels, we must conclude that in tbe examination of foreign vessels tbe consul performed a service not required by Jaw, but gratuitous at tbe instance of a party desiring a certificate. Tbe regulation of 1874 must be held to apply to such acts as are required by law to be performed by tbe consul in tbe discharge of bis official duty as tbe consular representative of tbe Government.
If, for commercial convenience, parties apply to tbe consul to perform acts not inconsistent with law or a faithful discharge of bis duty to tbe United'States, and be performs the acts, they are paid for by tbe party, and tbe law does not require tbe consulto perform such acts in tbe absence of any designation by tbe President that such acts are ‘ ‘ official services,” tbe fees so paid become tbe private emolument of tbe consul, and not tbe money of tbe United States. Tbe fact that tbe consul is employed because of bis relations to tbe Government, and the further fact that be attaches bis seal as evidence of tbe official character of the person performing tbe act, do not change tbe character of tbe compensation received by him from private to public or official fees within tbe meaning of the statute and regulations.
Tbe next charge is “ for certifying extra copies of quadruple invoices.” Tbe siim paid into the Treasury, and which has not been refunded by the Comptroller, of that class of fees amounts to tbe sum of $1,592. All such lees paid after tbe regulations of 1881 took effect have been refunded and are not now in controversy in this proceeding. Tbe sections of tbe law under which said service was rendered are as follows (Revised Statutes) :
“ Sec, 2853. All invoices of merchandise imported from any foreign country shall be made in triplicate, and signed by tbe *12 person owning or shipping such merchandise, if the same has actually been purchased, or by the manufacturer -or owner thereof, if the same has been procured otherwise than by purchase, or by the duly authorized agent of such purchaser, manufacturer, or owner.
# # # # # # #
u Sec. 2855. The person so producing such invoice shall at the same time declare to such consul, vice-consul, or commercial agent the port in the United States at which it is intended to make entry of merchandise; whereupon the consul, vice-consul, or commercial agentshall indorse upon each of the triplicates a certificate, under his hand and official seal, stating that the invoice had been produced to him, with the date of such production, and the name of the person by whom the same was produced, and the port in the United States at which it shall be the declared intention to make entry of the merchandise therein mentioned-. The consul, vice-consul, or commercial agent shall then deliver to the person producing the same one of the triplicates, to be used in making entry of the merchandise; shall file another in his office, to be there carefully preserved ; and shall, as soon as practicable, transmit the remaining one to the collector of the port of the United States at which it shall be declared to be the intention to make entry of the merchandise.”
The regulations of 1874, among other provisions on the subject of invoices, provides in paragraph 49: Consular officers will on the request of the proper collectors supply them free of charge with copies of any such documents on file in their offices as they may need in the discharge of their official duties.
Copies prepared by other persons for their own use will on request be certified on the payment of $2. When, however, duplicates of originals are required, or the copy is prepared by the consul, the schedule fee will be exacted as for the original service.
In the regulations of 1881 it is provided—
* * * “ Copies prepared by other persons for their own use will on request be certified on the payment of $2. When, however, duplicates of originals are required, or the copy is prepared by the consul, the schedule fee will be exacted as for the original service.”
The above extracts comprise the sections of the statute and paragraphs of the regulations which bear upon the question of the right of the claimant to the fees embraced in the second item of the claim, to wit, “ For certifying extra copies of quad *13 ruple invoices.” The term “ quadruple ” is not used in the statute nor in the regulations prior to act of June 10, 1880 (21 Stat. L., 173).'
By that act provision is made for quadruplicates by name, but it is provided—
“ That no additional fee shall be collected on account of any service performed under the requirements of this section.”
The tariff of fees embraced in paragraph 333 of rhe Consular Regulations of 1874, in item 36, prescribes a fee of $2.50 for “ invoices including declaration in triplicate.”
Nothing is said in the statement, of fees as to copies, but paragraph 491 prescribes a fee of $2. This charge is for certifying extra copies of quadruplicate invoices, and can only be performed under the seal of the consular office.
The act pertains to a duty specifically prescribed by the laws, of the United States, and, upon a tender of the fee, the party making application is entitled to have a certificate attached to the instrument, if it is a copy of the document executed in triplicate. The party being entitled to the certificate, it is the duty' of the officer to attach his official seal upon payment of the fees. This is an official duty, and the emolument becomes an official fee.
The third item of charge in claim is—
“For certifying invoices for goods in transit through the United States to other countries, $5,805.”
This amount was collected by claimant during the time he officiated as consul at Hong-Kong, and was paid into the Treasury. For the purpose of avoiding delay and annoyance the shippers of goods through the United States procured from the consul what is called “ transit invoices.” They are not the invoices referred to in the sections of the statute above quoted, but such invoices as accompanied goods in transit through the United States. The law did not require the consul to issue such certificates, and hence no provision was made for them either in the regulations of 1874 or 1881. Nor do the regulations of the Treasury Department require the consuls to perform any duty in relation to such goods. (Gen. Reg. Treas. Dept., 1884, p. 361.)
The next item for which claimant seeks a judgment is the *14 sum of $644.01 “for notarial and clerical work,” composed of the following charges:
(a) Fees collected from February 4, 1879, to December 31, 1880, for
recording instruments. ¡$39.29
{l) Fees collected from February 4, 1879, to September 30, 1880, for
cattle-disease certificates. 153.00
{o) Interest on deposits in bank at Hong-Kong' from February 4 to
June 30, 1882. 104.51
■(d) Fees collected from February 4, 1879, to December-31, 1879, for acknowledgments and authentications of signatures notary
public and certifying their official character. 48.00
(e) Fees collected during fourth quarter, 1881, for “ certificates of
shipments” or extra invoices. 292.00
•(f) Five per cent, commission on the estate of Alice Evans, May,
1881... 8.21
644.01
The first charge is for recording instruments ; but it does not appear from the specification or proof what was the character of the instruments recorded, and it is therefore impossible to determine whether the recording came within the regulations of 1874 or 1881. For aught we know, the instruments may have been those specially provided by the tariff of fees in the regulations prescribed by the President. The item of $152 is for cattle-disease certificates, and we find nothing in the laws of the United States nor in the regulations in relation to the duties or powers of a consul in reference to “ cattle-disease.”
The next item is for interest recovered by the claimant on deposit in a Hong-Kong bank from February 4, 1879, to June 30, 1882.
The funds of the United States in the hands of consuls are in legal contemplation in the personal custody and control of such officers; and for the purpose of protecting such funds, a safe is provided at the expense of the Government, in which they may keep the money coming into their hands as officers of the United States.
While it is their right to use the safe for the purpose of a depository, having given a sufficient bond to protect the United States against loss, if they choose to make a deposit in a bank, they and their sureties being responsible for the money, the act contravenes no positive law.
As applicable to this claim the law of trusts and trustees must be invoked, as the statute and regulations make no provision on the subject. The money of the Government in the hands of a public officer is a trust fund, and such officer must deal with it for the sole benefit of his trustee.
*15 Public officers differ from the ordinary trustee in not being required to make any investment of funds for the accumulation of interest. Their sole duty is to safely keep and account for the funds of the United States. The fundamental law of trust is that the trustee can not derive any benefit from the trust except such as are specifically provided as his compensation. All profits and accretions become in his hands a part of the trust, for which he must account to his “cestui que trust.”
When the money was paid by the bank it became a part of the fund in the hands of the consul, attaching itself and becoming a part of the trust fund in the hands of the consul, subject to the paramount claims and rights of the United States. Upon its payment into the Treasury it passed in law to the United States as effectually as a surplus of the original fund would have passed.
“ Trustees can not make any advantage to themselves out of the trust funds; and if they make more than legal interest they shall pay more, as,'if they make usurious loans, they sháll be charged with all their gains from the use of the money.” {Perry on Trusts, §468; Barney v. Saunders, 16 Howard, 543; Martin v. Rayburn, 42 Ala., 468.)
Item d is for—
“ Fees collected from February 4,1879, to December 31,1879, for acknowledgment and authentication to the signature of our official character of notary public, $48.”
It is not perceived how such a service became necessary, but inasmuch as it was rendered to a party desiring it, and as there is-no law of the United States making it the duty of the consul to render such service, the claimant is entitled to the amount received.
Item e—
“For fees collected during the fourth quarter of 1881 for certificates of shipment of extra invoices.”
This charge embraces the same character of services that are charged for in the second specification of fees alleged in the petition.
Item / is for fees in the settlement of the private estate of Alice Evans. For this service on the part of a consul'we find no regulation or law, and being of a private nature it is not perceived on what principle he is to account to the Government for such collections.
*16 The fifth claim as alleged is—
“ For services to foreign-búilt vessels carrying the American flag.”
During the official term of the claimant he paid to the defendant the sum of $584 on account of fees collected for ship- . ping and discharging seamen in foreign vessels sailing on the Chinese coast under the United States flag.
It is insisted by claimant that while he was “ empowered” to perform the services he was not required to do so by any statute of the United States; and the performance of the service not being required by law he has a right to all charges paid for such service.
■ Paragraph 194, Kegulations 1881, says:
“ In the case of American or foreign-built vessels purchased abroad and wholly owned by American citizens, it is known that the crews are usually made up of men who are not American citizens, and who have not acquired the character of American seamen under the law, as set forth in paragraph 198. Seamen of this class, when not serving under a contract made in the United States, are not regarded as within the jurisdiction of a consular officer as to their shipment or discharge.”
In the regulations of 1874, paragraph 131, the power and duty of a consul in relation to “ discharge of seamen” is defined as follows: The statutory authority of a consul to act in this respect is limited to (1) the sale in a foreign country of a ship or vessel belonging to a citizen of the United States; (2) the discharge, with his own consent, of a seaman or mariner-being a citizen of the United States; (3) a discharge after a survey of a vessel and finding of the same unseaworthy. The-duty performed in this instance was shipping and discharging seamen in a foreign-built ship sailing on the Chinese coast under the United States flag. The seamen were not American citizens, and did not ship from a port of the United States so-as to come within the provisions of paragraphs 129 and 130 of' the regulations of 1874.
Article 128 of the regulations of 1874 defines in a general way who are to be regarded as seamen within the meaning and purpose of that act-,” but the second clause of article 131 is more-specific in its definition of the duty of a consul in relation to.seamen.
*17 The last and sixth charge in the claim is—
“ For certifying invoices for goods exported to the United States which were on the free list.”
For the performance of that- service the claimant has collected and paid into the Treasury the sum of $2,095. The legal theory upon which the claim is based is, that the law-does not require an invoice on goods not subject to a tax;.that as consul he has no official duty to perform towards that class of goods; that the service is performed at the instance of the shipper for his convenience; that it is a matter purely personal between the consul and the party who voluntarily pays the fees; and that, as the Government is not interested in the goods, there can be no obligation on the part of the consul to account to the United States for such fees.
Section 2.851 of the Eevised Statutes prescribes a fee of $2.50 for every verification of an invoice or certificate before a consul or commercial agent. Section 2852 makes the value of the invoice evidence of the value of the goods in any court of the United States. Section 2853 provides for triplicate invoices, and section 2854 provides that all such invoices shall, before the shipment of the goods, have indorsed on them a declaration signed by the purchaser, manufacturer, owner, or agent showing, if subject to ad valorem duty, the value of the goods, and, if subject to specific duty, the quantity of the same, and that no other invoice differing from the one set forth in such declaration will be furnished to any one. If the merchandise was actually purchased, the certificate shall show that the currency of the invoice and the purchase is the same.
This is the substance of the different sections of the Eevised Statutes which affect the question in dispute. The purpose in this particular is evidently to so guard the transportation and shipment of goods that the revenue of the United States shall be protected against the importation of goods having a duty imposed on them as a tariff either ad valorem or specific with-o'ut the payment of that duty. The invoices provided by law have in view that direct purpose, and the different requirements of section 2854 clearly identify the character of invoices contemplated in the preceding sections of the law.
The certificate to an invoice of goods, free of duty so far as the requirement of the statute goes, is not within the spirit and *18 purposeof the law, and must be held as a non-official paper. The regulations of 1874 and of 1881 prescribe a fee in the tariff of fees for certifying to an invoice of goods, but did those regulations intend to go beyond the statute and prescribe as official a fee which in legal contemplation the consul was not expected to earn or collect ? While the President has full control of the question of determining what shall and what shall not constitute official fees, it must appear clearly from the regulations that he intended to include in official fees (which must be accounted for) the charges and collections for non-official acts before such charges and collections become proceeds in the hands of a consul liable to the demands of the Government.
It is the judgment of the court that the claimant recover the sum of $13,839.21 for the different items indicated by this, opinion.
Davis, J., did not sit in this case, and took no part in the decision.