ANDERSON *et al.* v. BLAIR, for use, etc.

1. The negligent failure of the mayor and council of a municipal corporation to discover a shortage in the accounts of the city clerk, and the publication by them of a report stating that his accounts for specified years are satisfactory, will be no defense to sureties on the official bond of the clerk subsequently given, when sued on the bond for a defalcation occurring after the bond was executed.

2. Nor will the payment by the mayor and council to the clerk, after the shortage occurred, of a sum due him by the city discharge the sureties, when the

mayor and council did not know of the defalcation ; and this is true though they might have discovered it had they exercised proper diligence.    *Walsh* v. *Colquitt*, 64 *Ga.* 740, explained and qualified.

3. The execution of an instrument sued on need not be proved when no plea of non est factum is filed ; and this is true though the paragraph of the petition alleging due execution of the instrument be denied in an answer not sworn to.

4. An extract from the minutes of a municipal corporation, certified by a person described as "clerk of council," is admissible in evidence, over an objection that the extract is not certified by the person holding the office of clerk to the corporate authorities, who are described in the charter as the "mayor and council" of the city.

5. It is erroneous to strike, on the ground that it is too general and indefinite, an exception of fact to an auditor's report, in a case at law, which assigns a specified finding of the auditor as being "contrary to evidence," or "without evidence to support it."

Argued May 24,—Decided November 11, 1904.

Exceptions to auditor's report. Before Judge Fite. Cobb superior court. November 18, 1903.

*H. B. Moss*, for plaintiffs in error.

*D. W. Blair* and *J. E. Mozley*, contra.

Fish, P. J. This is an action on the official bond of the clerk of a municipal corporation, and is the third appearance of the controversy in this court. The bond was made payable to D. W. Blair, mayor of the City of Marietta, and to his successors in office. The action was originally brought by Brumby, mayor of Marietta, as successor to Blair, and this court held, that, as the charter of Marietta required the clerk to give bond to the mayor and council, the bond sued on was not a good statutory bond, though a good common-law obligation, and that an action on it could not be maintained by a successor to Blair in the office of mayor. *Anderson* v. *Brumby*, 115 *Ga.* 644. Subsequently an action was instituted on the bond by Blair, the obligee, for the use of the board of education, it being alleged that the clerk had misappropriated funds which should have been paid over to the treasurer of that board. There was a demurrer to the petition, and when the case reached here this court ruled that the suit was properly brought, and that the petition set forth a cause of action against the principal and sureties on the bond. *Anderson* v. *Blair*, 118 *Ga.* 211. The case was thereafter referred to an auditor, who made a report finding in favor of the plaintiff a specified amount against the principal and sureties on the bond.

The sureties filed numerous exceptions of law and fact to the auditor's report. At the hearing all of the exceptions of fact were stricken, on the ground that they were too general and indefinite. The exceptions of law were then overruled, and judgment was entered by the court in favor of the plaintiff, without the verdict of a jury, for the amount found by the auditor. The bill of exceptions assigns error upon the striking of the exceptions of fact, and upon the overruling of the exceptions of law, and specially complains that the court had no power to enter up judgment without the intervention of a jury.

1. In several of the exceptions of law the contention is set forth that the sureties were discharged by reason of the laches, neglect, and misrepresentations of the mayor and council, on account of which the defendants were induced to become sureties on the bond sued on. The bond was dated January 14, 1896. The defendants offered an amendment, in which it was alleged that Lawhon, the principal in the bond sued on, was clerk during the years 1894 and 1895; that he made the city council monthly reports; that these reports were uniformly adopted, entered as correct on the minutes, and published in a local newspaper; that at the end of the term of office for 1894 and 1895 the clerk made a final report, which was likewise adopted and published in an issue of the local newspaper, dated January 6, 1896, the publication containing the statement that "the accounts of the clerk are very clear and satisfactory." It is averred that Anderson, one of the sureties, was induced by these reports and publications, especially that of January 6, to become surety on the bond sued on, and that at the time the final report and publication were made the clerk was short in his accounts $199.60, for the years 1894 and 1895; that the mayor and council afterwards admitted this defalcation by bringing suit against the clerk on account thereof; that "the shortage now claimed against said Lawhon and against these defendants was known by plaintiff and privies and by the usee from the earliest incipiency of any shortage. In 1895 plaintiffs knew this shortage was accruing, and failed and refused to make the same known to this defendant, Saxon A. Anderson." The 7th paragraph of the amendment averred that after the shortage now sued for had accrued, the mayor and council paid to Lawhon $150 out of funds belonging to the city, know-

ing that he was insolvent at the time. It is alleged that, by reason of these facts, the sureties are discharged. The auditor struck, on demurrer, all of the amendment except paragraph 7 Another amendment, similar in purpose, was also stricken, except as to averments similar to those contained in paragraph 7 of the amendment above alluded to. In the paragraph of the latter amendment not stricken, it was averred that at the time the money was paid to Lawhon, the mayor and council knew that the board of education claimed that he was short in his accounts. Several other exceptions complain of the rejection of evidence offered to support the contention set up in those portions of the amendments which were stricken. None of the evidence rejected, however, was sufficient to indicate that at the time the money referred to in the amendments was paid over to the clerk by the mayor and council, they had any actual knowledge of the shortage in his accounts.

The rule as between individuals is, that "Wherever, . . . with the knowledge or assent of the creditor, there is any misrepresentation to, or even concealment from the surety, with regard to any material fact, which, had he been aware of, he might not have entered into the contract of suretyship, it will thereby be rendered invalid, and the surety will be discharged from his liabilities." Rees *v.* Berrington, 2 Lead. Cas. in Eq. 1871. In Graves *v.* Lebanon Bank, 10 Bush, 23, 19 Am. Rep. 50, the directors of the bank published a statement whereby it appeared that the affairs of the bank had been well managed. The cashier was a defaulter at the time, and certain persons were induced by the published statement to become sureties on his bond. In an action on the bond, for subsequent embezzlements, it was held that the sureties were not liable, they having a right to believe that the directors of the bank had used proper diligence in examining the affairs of the bank. There was nothing in that case to indicate actual knowledge by the directors of the cashier's defalcation at the time of the publication. It has, however, been held that even as between individuals "mere laches, unaccompanied with fraud, is no ground of discharge." Mut. Loan Assn. *v.* Price, 16 Fla. 204, 19 Fla. 127. See also, in this connection, *Fidelity Co.* v. *Gate City Bank,* 97 *Ga.* 634, 637; *Lamar* v. *Walton,* 99 *Ga.* 356. It is not, however, our purpose to decide what would be the correct rule with

reference to this matter between individuals; for sureties on the bonds of public officers are not in all respects governed by the same rules as control in cases where only individuals are concerned. As to these sureties the rule has been thus stated: "The sureties on the official bond of a public officer are not exempt from liability for any default of their principal by reason of the fact that such default occurred in consequence of the act or omission of another officer, as where such other officer neglected to require a periodical accounting by the principal in the bond according to law, or permitted him to remain in office after knowledge of his incompetency, dishonesty or dereliction of duty, instead of removing him, and without informing the sureties of the facts. The principle here involved is that the statutory provisions for supervising the conduct of subordinate public officers are solely for the security and convenience of the government, and form no part of the contract of the sureties on the official bonds of such officers. Furthermore, the government is not responsible for the wrongful conduct of its officers, and sureties are presumed to enter on their contract with full knowledge of this rule of law, and to consent to be dealt with accordingly." 27 Am. & Eng. Enc. Law (2d ed.), 544. See also 24 Am. & Eng. Enc. Law (1st ed.), 883. Mr. Brandt in his work on Suretyship (vol. 2, 2d ed., § 555) says: "All the officers of a government or corporation should observe its laws and regulations, and the sureties of one officer can not set up as a defense, when sued for the misconduct of their principal, the fact that another set of officers have neglected or violated their duty. It should be borne in mind that all the officers of a government or corporation are its agents only, and can not bind their principal by acts or defaults, which are not only unauthorized but are expressly prohibited. The sureties of an officer of a government or corporation are not discharged by reason of the fact that his accounts are not examined by other officers thereof at the time prescribed by law; nor by reason of the fact that such accounts are so negligently examined as not to discover existing defalcations; nor by reason of the fact that money far exceeding the proper amount is negligently permitted to remain in the hands of the principal. The sureties of a public officer are not discharged by the failure of the government to notify them of his default. The surety must in such case take notice of his principal's defaults."

From the large number of cases dealing with this subject we have selected a few which illustrate the rules above quoted. In our own reports the case of *Mathis* v. *Morgan*, 72 *Ga.* 517, very clearly illustrates the principle. There a surety on the bond of a bank as a State depository was sought to be held liable for a failure of the bank to account for funds of the State entrusted to it. It was held that the surety would not be discharged by reason of the fact that the Governor selected the bank as a solvent bank and published it as such, when in fact the bank was insolvent at the time of the selection; that the object of the bond is to guarantee the solvency of the bank, and the failure of the Governor to ascertain the condition of the bank would be no defense; and that the surety was not relieved from responsibility because the principal did not make returns to the Governor according to law, or because the Governor did not discontinue or remove the principal as a depository. In Jones v. United States, 18 Wall. 662, it was held that in a suit by the government against the sureties on the official bond of a postmaster, it is no defense that the auditor of the treasury for the post-office department knew of previous defalcations and that the postmaster was allowed to remain in office where he could commit subsequent acts of embezzlement. A similar ruling was made in a case in Canada, where the plea was that the postmaster-general knew that the postmaster had converted moneys to his own use, and did not inform the sureties, but continued him in office for three years. Regina v. Pringle, 32 U. C. Q. B. 308. In Commissioners. v. Sheehan (Minn.), 5 L. R. A. 785, it was held that neither the negligence of county commissioners in respect to their supervisory duties over the county treasurer, nor "their actual malfeasance, facilitating or encouraging a conversion of the public funds by the treasurer," is a defense to an action against the treasurer and the sureties on his official bond. In the opinion Dickinson, J., said: "The official bond of the county treasurer is intended to secure the public from loss by reason of the official delinquency of that officer. For that purpose a bond is required. For that purpose it is to be deemed to have been given. The obligation of the sureties of the treasurer is such as is declared in the condition of the bond. It is not contingent upon the integrity of other public officers, nor upon the faithful performance by them of their

official duties.    The sureties upon such a bond enjoy whatever protection there may be in the law imposing supervisory duties upon other public officers; but there is no undertaking or guaranty on the part of the county or of the State in favor of such sureties, either express or implied, that the requirements of the law shall be complied with,—that public officers shall perform their prescribed duties; nor that they shall not be guilty of criminal malfeasance."    "Sureties, like other men, are bound to use some diligence for their own protection, and if they fail to do so, it is their own fault."    Detroit *v.* Weber, 26 Mich. 284.    In Manley *v.* City of Atchison, 9 Kans. 358, it was held that it would be no defense to sureties on the bond of a city treasurer that the mayor and council made an illegal contract with the treasurer permitting him to use funds of the city, and that the fact that such contract was made was concealed from the sureties likewise afforded them no defense.    It was there said:    "The whole fallacy of the argument of the plaintiffs in error lies in confounding the mayor and council of a city with the city itself. Although their powers are greater, they are no more the city than is the city marshal, or the city attorney; and either of these officers would have had as much right to make a contract with the treasurer, such as was attempted to be proven in this case, as had the mayor and council; and a contract with either would have been as valid and binding."    A similar ruling was made in Supervisors *v.* Knipper, 37 Wis. 496.

In Bower *v.* Commissioners, 25 Pa. St. 69, it was ruled that " An erroneous publication by the commissioners of a county, misstating the condition of the accounts of a collector of taxes, for one year, is no ground for the discharge of the sureties in the bond of the same collector for the following year."    In the opinion it was said that the sureties had no right to rely on the publication, and doubt was expressed whether they would be entitled to relief even if the erroneous information had been obtained at the office of the commissioners; the general rule being that " those who suffer for the mistakes and misconduct of public officers must look to them for compensation, and not to the public."    In Inhabitants of Farington *v.* Stanley, 60 Me. 472, it was ruled that the sureties on a town treasurer's bond would not be released by the fact that the selectmen of the town certify the treasurer's

account to be correct, when in fact there is a deficit, even if the certificate be made known to the sureties soon after its entry upon the treasurer's books, and while he has attachable assets to cover the deficit, though he subsequently dies insolvent. To substantially the same effect was the ruling in State v. Bates, 36 Vt. 387. See also, in this connection, Bush v. Johnson County, 32 L. R. A. 223; Board of School Directors v. Brown, 33 La. Ann. 383; Stern v. People, 102 Ill. 540; Board of Supervisors v. Otis, 62 N. Y. 88. It is apparent from these authorities that the contention of the sureties in the present case can not be sustained. The municipal corporation of Marietta is a branch of the State government, and a bond given to it by one of its officers is to be governed by the same rules as one given the State by its officer. The alleged acts of neglect and misconduct were acts of other officers of the city, and not of the city itself. The undertaking of the sureties was to see that their principal performed all the duties of his office. It was necessary to their protection that they should ascertain for themselves the character of the man for whose integrity they became bound. They guaranteed his honesty. The city did not. The very object of the bond was to protect the city against a dishonest or negligent official. The fact that some other officers of the city negligently, or even corruptly, failed to ascertain the true state of the clerk's account, and published to the world that they were satisfactory, could not excuse the sureties for their negligence in failing to examine for themselves, before they signed the bond, to ascertain whether their principal was a man of such character as to justify the assumption by them of the obligation which they undertook. No good reason appears, so far as the sureties are concerned, why the government or one of its political branches might not employ a man knowing that he had been in the past guilty of official misconduct or even crime, and take a bond with sureties for future good behavior; and the fact that when this was done agents of the government fraudulently induced persons to become sureties, by representing that the principal was a man of high character, would afford the sureties no defense when it was sought to hold them liable on the bond for the subsequent misconduct of their principal.

No reason occurs to us why the rule with respect to the matter

above dealt with should be different because the bond did not conform strictly to the requirements of the city charter. When the case was here at the March term, 1903 (118 *Ga.* 211), it was held, that the bond was a good voluntary or common-law obligation, and that, under the provisions of the Civil Code, § 263, it stood in the place of the official bond required by the charter. The only difference between the bond given and the one required was as to the person authorized to sue on it. The remedies for its . enforcement were the same, and the same defenses might be made by the sureties. Their obligation was the same as if the bond had conformed to the charter, and they are no more excusable on account of the neglect or malfeasance of other officers of the city than if the bond had been in strict conformity to the charter.

2. It would seem to follow from the authorities above cited, and the reasoning upon which they are based, that the payment to one public officer by another of an amount due the former by the government, at a time when the officer making the payment knew that the other official had misappropriated public funds, would be no defense to the sureties on the bond of the officer guilty of the official misconduct. This court has, however, ruled otherwise in *Walsh* v. *Colquitt*, 64 *Ga.* 740, where it was held that the action of the Governor in paying the public printer a debt due him by the State for professional services, after he had misappropriated and converted to his own use public funds, discharged the sureties on his official bond. We are not disposed to extend the principle of the decision referred to beyond the facts of the particular case. The ruling seems to have been made broadly, that the mere payment after the defalcation occurred discharged the sureties. The original record in the case shows that on January 24, 1876, the sureties notified Governor Smith that their principal had misappropriated more than one half of $5,000 advanced to him by the State, and had given orders on the treasurer to satisfy personal claims against him. On May 5, 1877, Governor Colquitt paid to the printer a fee of $15,000 due him by the State for professional services. Suit on the bond was brought in August, 1877, and the sureties pleaded this payment as a discharge, and expressly averred that at the time the payment was made the Governor knew of the public printer's defal

cation, as well as of his insolvency.   There is in the record an
affidavit from Governor Colquitt, in which he states, that when
the payment was made he knew of the public printer's insol-
vency; that he knew his accounts were complicated, and also
knew that it was claimed he had misappropriated part of the
$5,000 advanced by the State; that the printer contended that
this shortage was settled by the appointment of his successor,
who was to pay the shortage, and that he also contended that he
had done work for which he had no bills or vouchers.   The fact
that the sureties had been diligent, had discovered the shortage,
and had in writing notified the chief executive, and the further
fact that the Governor knew of the claim that the public printer
was a defaulter, are sufficient to distinguish the case above cited
from the one now before the court.   As stated above, none of the
evidence rejected tended to show that the mayor and council had
any actual knowledge of the clerk's defalcation or of the claim
that he was a defaulter.

3. Objection was made before the auditor to the introduction
in evidence of the bond sued on, on the ground that its execution
had not been proved.   There was no plea of non est factum, and
hence there was no merit in this objection.   Civil Code, §§ 3701,
5066; *Wylly* v. *Screven*, 98 *Ga.* 213; *Torras* v. *Raeburn*, 108 *Ga.*
345 (3).   The fact that the execution of the bond was denied in a
paragraph of the defendant's answer, which was not sworn to, can
make no difference.   Matters which must be specially pleaded
can not be taken advantage of by a denial in an answer, even
though no objection is made thereto.   See Civil Code, § 5053.

4. A number of exceptions of law contain assignments of error
upon the admission of various extracts from the minutes of the
mayor and council and from the tax digest, the extracts being
certified by an officer who described himself as "clerk of council,"
or as "clerk of council of the City of Marietta."   The objection
was that there was no such officer as the one described, and a
certificate from him would not entitle a document to which it was
attached to be admitted in evidence.   The office of clerk to the
Mayor and Council of Marietta is not one which need be de-
scribed in any particular way.   Any description is sufficient
which identifies the person who acts in that capacity and who as
such has custody of the official records of the city.   The act

which created the office described the incumbent as "clerk of council." Acts 1851–2, p. 392, sec. 6. The officer is described in this way in several of the certificates to the extracts objected to. The addition of the words "of the City of Marietta," in other certificates, simply made more definite a description which was sufficient without them. The objection was obviously without merit.

5. We think the court erred in striking the exceptions of fact. An exception which distinctly points out the finding of the auditor on a given issue, and then avers that such finding is "contrary to the evidence," or "without evidence to support it," is sufficiently definite to raise an issue, in a case at law, for determination by a jury. An assignment of error in the language quoted is equivalent to saying that there was no evidence upon which to base the particular finding referred to; and it is difficult to understand how the assignment of error could be made more definite. It has been the uniform rule in this State to consider sufficiently specific a ground of a motion for a new trial which assigns the verdict of the jury as being contrary to evidence, or without evidence to support it, and no substantial difference occurs to us, with respect to this matter, between a motion for a new trial and exceptions to an auditor's report. A general assignment of this kind was treated as being sufficiently definite in *Poullain* v. *Brown*, 80 *Ga.* 27, involving exceptions to an auditor's report in a case at law. The ruling of the trial judge in striking the exceptions of fact in the present case probably arose from a misapprehension of previous decisions of this court in equity cases. Thus, in *Butler* v. *Ga. & Ala. Ry.*, 119 *Ga.* 959, exceptions of fact in an equity case were couched in much the same language as the exceptions of fact in the present case; and it was there held that the failure of the excepting party to exhibit with his exceptions, or point out by appropriate reference to the auditor's brief of evidence, the evidence introduced on the subject referred to in the exception would afford the trial judge a sufficient reason for refusing to approve the exceptions of fact. It was not held in that case that the assignment of error was inherently bad. The trial judge might have approved the exceptions if he had seen proper to do so. The whole matter was in his discretion, and this court will rarely, if ever, control it where the

evidence is conflicting.   In the case cited the judge did not see proper, upon the general exceptions filed, to search through the entire mass of evidence, and the ruling was simply to the effect that in an equity case, where the judge has a broad discretion in dealing with exceptions of fact, this court would not require him to do·so.   It is very different, however, where the case is one at law, in which the excepting party has a constitutional right to have his exceptions of fact passed on by a jury.   *Weed* v. *R. Co.*, 119 *Ga.* 577.   In such a case the judge has no discretion, but must submit the exceptions to the jury along with the evidence as contained in the auditor's report.   Where there is no conflict in the evidence, the judge may direct a verdict either for or against the exceptions.   See *Weaver* v. *Cosby*, 109 *Ga.* 310, 313, where it was said that even where there is no conflict in the evidence the judge can not enter up judgment without a verdict. We do not, of course, mean to hold that the judge has no authority to strike exceptions of fact in a law case.   He may do this where the exceptions are too indefinite to raise any issue of fact for submission to a jury, but the exceptions in this case do not belong to that class.

The evidence did not demand a finding in favor of the plaintiff. Lawhon, the clerk, testified positively that he was not short in his accounts as claimed by the plaintiff; and· if the jury believe this statement, the securities should of course be discharged.   The case is therefore remanded, that this and any other issues of fact raised by the evidence may be passed upon by a jury, in the light of the rulings herein made on the questions of law involved.

*Judgment reversed.   All the Justices concur.*